## JOHNSTONE *v.* TALIAFERRO.

The words "child" and "children," appearing in a deed conveying to an unmarried female certain property during her life, and at her death to such child or children as she may leave living at the time of her death, will not include an illegitimate child of such female born several years after the making of the deed, unless it plainly appears from the language of the instrument that it was the intention of the grantor that an illegitimate child was to take thereunder. The word "issue," used in a subsequent part of the deed under consideration in the present case, is to be given the same meaning as the words child or children.

Argued February 7, — Decided March 17, 1899.

Equitable petition.    Before Judge Falligant.    Chatham superior court.    March 19, 1898.

*Burton Smith, Mercer & Mercer* and *Spencer R. Atkinson,* for plaintiff. *Saussy & Saussy* and *Erwin, duBignon, Chisholm & Clay,* for defendants.

COBB, J.  Florence Barclay Johnstone filed a petition to the superior court of Chatham county against C. C. Taliaferro as an individual and as trustee under a deed hereinafter referred to, alleging that Margaret Marshall was a foundling left by some one unknown upon the steps of the residence of Mary M. Marshall; that it was never known who were the parents of Margaret Marshall, but it was supposed that she was a natural child born out of wedlock; that Mary M. Marshall became so attached to her that she was adopted as her child and given the name of Marshall; that she was known as Maggie Moonshine, because of the fact that she was discovered on the doorstep on a bright moonlight night; that the supposed circumstances of her birth and parentage did not interfere in any way with Mary M. Marshall becoming sincerely attached to her, treating her as if she were her own child; that Margaret Marshall intermarried with A. A. E. W. Barclay, and a daughter, Mary M. Barclay, was the offspring of this union. On the 30th day of May, 1874, Mary M. Marshall executed a trust deed, the following being a copy of all the provisions in the same that are material in the present case:

"Whereas, on the 23d day of December, in the year of our Lord one thousand eight hundred and sixty-eight, the said Mary M. Marshall, in the presence of George W. Wylly, W. W. Paine and John Cooper, did make and publish her last will and testament disposing of her property in manner and form set out in the following language: [The provisions contained in items 1, 2 and 3 are immaterial to the proper consideration of this case.]

"'Item fourth. All the rest and residue of my estate of whatever kind and character and description, either real, personal, or mixed, and wherever situated, which I may leave at the time of my death, I give, devise and bequeath unto my executors hereinafter named, in trust nevertheless to and for the sole and separate use of Mary M. Barclay, the daughter of my adopted daughter Margaret Marshall, late deceased, for and

during the term of her natural life, free from debts, contracts, or control of any husband with whom she may hereafter inter-marry, and from and after the death of the said Mary M. Barclay, then in trust for such child or children of the said Mary M. Barclay as she may leave living at the time of her death, share and share alike, if more than one, as tenants in common, their heirs and assigns forever, the representatives of a deceased child to stand in the place of the parent, and to take per stirpes and not per capita. (The allowance of a liberal income to be made by said executors hereby created trustees to the said Mary M. Barclay under the directions of a court of equity until she arrive at the age of eighteen years, after that time the whole net income to be given to her, the excess of income in the pre-ceding years to be invested in other property to be held upon the same use and trusts as are in this will expressed; but if the said Mary M. Barclay should depart this life leaving no such child or·children or representative of children living at the time of her death, then and in that case, I give and be-queath [here follows a bequest of certain property, upon the happening of the contingency mentioned, to the Wardens and Vestrymen of Christ Church in Savannah for a parsonage].

"'Item fifth. The rest and the residue of my property which may remain after the death of the said Mary M. Barclay with-out leaving issue living at the time of her death, as aforesaid, deducting the said lots on West Broad street, mentioned in the immediately preceding item of this my will, I give, devise and bequeath to the said The Wardens and Vestrymen of the Episcopal Church in Savannah called Christ Church, for the purpose of erecting an orphan asylum and a house of industry for the indigent poor of the City of Savannah on such lots of land within the limits of the City of Savannah as to them may seem suitable for that purpose, and for the endowment of said institution.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . .  .  .

"'Item six. I desire and direct that the said Mary M. Bar-clay shall be liberally educated, and that a governess shall be employed for her with an adequate salary, until she arrives at mature years, that said Mary M. with the said governess shall

reside in my house on West Broad street, and that the gov-
·erness shall be changed should said Mary M. become displeased
with her.'

[Here follows a recital that, in a codicil to the will above
·set out, James J. Waring and Mary M. Barclay had been ap-
pointed executor and executrix thereof respectively, and that
the following second codicil to the will had been published :]

"'It is my will, and I do hereby direct, that the allowance
from the income of my estate to be given to Mary M. Barclay,
the daughter of my adopted daughter Margaret Marshall, after-
ward Margaret Barclay, until she shall attain the age of eigh-
teen years, as also the entire net income of my said estate from
that time until she attain the age of 21, shall be subject to the
judgment and control of James J. Waring, the executor nomi-
nated in my first codicil, who shall hold the same for the ex-
·clusive benefit of the said Mary M. Barclay, and it is my wish
that under no circumstances shall A. A. E. W. Barclay, the
father of the said Mary M. Barclay, have any of the said in-
·come, or claim a natural guardianship over her person' :

"And whereas, on the 8th day of April in the year 1874, a
petition was filed in the court of ordinary of Chatham county
by Albert R. Lamar, solicitor-general, etc., under instructions
from a grand jury of the superior court of the said county,
praying that a guardian might be appointed of the person and
property of said Mary M. Marshall, according with the provi-
·sion of section 1855 of the Code of Georgia; and whereas the
said Mary M. Marshall is apprehensive that, although a deci-
sion was rendered by the said ordinary on the 30th day of said
month of April, refusing the appointment of a commission, on
the ground that said application had not been made in proper
form and with proper verification, yet that the same effort in
·some other form may be repeated, and although she is now in
full possession of her mental facilities [?] and is fully able to
take care of herself and her property, yet that the time may
·come when the advance of years may produce such effect upon
her as to invite the renewal of the same effort to place her and
her property under the control of some person not of her own
·selection; and whereas she, the said Mary M. Marshall, prefers

to guard against the danger of such result by exercising now her right and power to select for herself the person to be intrusted with that care and management of her property, whenever disease or infirmity may incapacitate herself:

"Now, then, this indenture witnesseth, that the said Mary M. Marshall, for and in consideration of the premises, and of the sum of five dollars to her in hand paid by the said James J. Waring at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has given, granted, bargained, sold, . . and by these presents doth give, grant, bargain, sell, . . all the tracts or parcels of land premises hereinafter particularly described, situate, lying and being in the city of Savannah, and in the county of Chatham and in the State of Georgia, that is to say, [here follows a. description of the property conveyed] and any other and all other property which may hereafter belong to the said Mary M. Marshall. To have and to hold all and singular the above-described lots, parcels, and tracts of land and premises, with the appurtenances and any and all other the said property hereinbefore described and referred to, unto him, the said James J. Waring, in trust nevertheless to and for the only proper use, benefit, and behoof of the said Mary M. Marshall, for and during the remainder of her natural life, the rents, profits and income thereof to be disposed of by herself, or in accordance with her directions, so long as she may be able to collect, manage, and dispose the same; but if at any time hereafter said Mary M. Marshall, from disease or infirmity, or from any cause, shall be unable to collect, manage, and dispose of the said rents, profits and income, and should be unable to give direction, management, and disposition of the same, then and in that event, in trust to collect and receive the said rents, profits and income, and to apply so much thereof as may be proper and necessary to the support of the said Mary M. Marshall, liberally supplying her with all the comforts of life, and further to apply as much thereof as may be required, indicated, and called for by the said Mary M. Barclay, in order to provide liberally for all of her wants as a young person in her station of life, investing whatsoever surplus may thereafter remain

subject to the same use and trust; and after the death of the said Mary M. Marshall, and until the said Mary M. Barclay shall attain the age of 21 years, to apply the entire net income, or so much thereof as shall be required, indicated, and called for by the said Mary M. Barclay, to her support and use, investing whatsoever surplus may thereinafter remain, subject to the same uses and trusts; and after the death of the said Mary M. Marshall and after the said Mary M. Barclay shall have attained the age of 21 years, or shall have departed this life, with or without issue, then to hold the said property subject to the trusts which are explicitly set forth in recitals of the contents of the said the last will and testament of the said Mary M. Marshall, and the codicils thereto, which said recitals are hereinbefore contained, and which to that end are made part and parcel of this deed of indenture."

On the 7th day of March, 1893, the defendant Taliaferro was "duly appointed as substituted trustee" under the deed above referred to. It is further alleged in the petition, that plaintiff is the natural son of Mary M. Barclay born out of wedlock in the year 1878; that after the birth of plaintiff his mother intermarried with the defendant Taliaferro, and that there are now living three children the offspring of this marriage; that Mary M. Barclay has departed this life; that since her death Taliaferro has furnished petitioner with what was necessary for his support and education until about a year before the filing of the petition, but that since that time the defendant has totally failed and refused to furnish anything to petitioner; that petitioner, under the terms of the deed above referred to, is entitled to a one-fourth interest in the property described in that deed, which property is in the hands of the defendant as trustee. The prayer is, that an accounting be had, and that petitioner recover his interest in the property. To the petition the defendant filed demurrers, both general and special, which were sustained by the court. To this ruling the plaintiff excepted. The plaintiff contends that he is entitled to share in the property described in the trust deed, under that part of the paper purporting to be a will which is embodied in the deed and which declares that from and after the death of Mary M.

Barclay the property shall be held "in trust for such child or children of the said Mary M. Barclay as she may leave living at the time of her death, share and share alike, if more than one, as tenants in common, their heirs and assigns forever, the representatives of a deceased child to stand in the place of the parent, and to take per stirpes and not per capita." It is also contended that the word *issue,* appearing in a subsequent clause of the deed which provides for a limitation over in the event that Mary M. Barclay should die "without issue," should be given a broader signification than the word *children,* and that for that reason the words child or children wherever contained in the deed are to be given the same meaning as would be given the word issue.

Construing this deed as a whole, it does not appear that the use of the word issue was intended by the grantor to in any way alter the meaning which would ordinarily be given the word children, nor to enlarge the meaning of that word, even if, under some circumstances, the word issue should be construed to embrace illegitimate children. Treating the terms children and issue as having been used in identically the same sense in the trust deed under which the plaintiff claims, it becomes necessary to determine who were intended by Mrs. Marshall to be the recipients of her bounty when she said that the property described in the deed should go to the *children* of Mary M. Barclay upon her death. It becomes necessary in the first instance to determine whether under the law of this State the words child or children, when used in a deed or will, would embrace other than legitimate children. Mr. Schouler in his work on Domestic Relations thus describes the status of a bastard at common law: "The rights of a bastard are very few at the common law; children born out of a legal marriage having been from the earliest times stigmatized with shame, and made to suffer through life the reproach which was rightfully visited upon those who brought them into being. The dramatist depicts the bastard as a social Ishmaelite, ever bent upon schemes for the ruin of others, fully determined to prove a villain; thus fitly indicating the public estimate of such characters centuries ago in England. The law-writers, too,

pronounce the bastard to be one whose only rights are such as he can acquire; going so far as to demonstrate, by cruelly irresistible logic, that an illegitimate child can not possibly inherit, because he is the son of nobody; sometimes called *filius nullius*, and sometimes *filius populi*.   Coke seemed to concede a favor in admitting that the bastard might gain a surname by reputation though none by inheritance.   The most important disability of an illegitimate child at common law is that he has no inheritable blood; that he is incapable of becoming heir, either to his putative father or to his mother, or to any one else; that he can have no heirs but those of those of his own body." Schouler's Dom. Rel. §§ 276, 277.   See also 1 Black. Com. 459; 2 Kent's Com. (14th ed.) 212; 4 Ibid. 413; 3 Am. & Eng. Enc. L. 891.

The condition of a bastard under the law of this State is the same as it was at common law, except in so far as it has been ameliorated by statute.   In 1816 the General Assembly passed an act in relation to escheats, which declared that, "Where any woman shall die intestate, leaving children commonly called illegitimate or natural, born out of wedlock, and no children born in lawful wedlock, all such estate whereof she shall die seized or possessed of, whether real or personal, shall descend to, and be equally divided among such illegitimate or natural-born children and their representatives, in the same manner as if they had been born in wedlock; and if such illegitimate or natural-born child shall die intestate, without leaving any child or children, his or her estate, as well real as personal, shall descend to, and be equally divided among his or her brothers and sisters, born of the body of the same mother, and their representatives, in the same manner, and under the same regulations and restrictions, as if they had been born in lawful wedlock."   Acts 1816, p. 40.   The reason for passing this act is stated in the preamble to be, that the term heirs "has been so construed as to prevent children, born of the body of the same mother, from being capable of inheriting or transmitting inheritances."   In 1829 an act was passed for the "relief of certain fortunate drawers" in a land lottery which had been authorized by law; and it was declared in that act that the fact

that the drawer was an illegitimate child should not interfere with his rights to the land drawn, and that "Whenever any illegitimate child, having drawn a lot of land in said lottery and who has or may die intestate without child or children, or the representatives of children, and without brothers or sisters on the maternal side, then and in that case the said land shall descend to and vest in the mother." Acts 1829, pp. 121–2. In 1850 the act of 1816, supra, relating to escheats, was amended so as to provide "That from and immediately after the passage of this act, all bastards or natural-born children of widows, when said widows shall die intestate, shall inherit the real and personal estate of their deceased mothers, acquired and accumulated during widowhood, equally with the child or children of said widows born in lawful wedlock — any law, usage or custom to the contrary notwithstanding." Acts 1850, p. 172.

In 1855 the General Assembly passed an act "to prescribe the order of descent and succession of the estates of illegitimate persons who die intestate," which provides as follows: "When any person shall depart this life intestate, who by law is illegitimate, having a widow or widows and child or children, or their descendants, then the property of such illegitimate person shall descend to, and belong to, such persons as would inherit the same were such person legitimate. If such illegitimate person shall leave no widow, or child or children or the descendants of a child or children, then the property of such illegitimate person shall descend to and belong to such persons of the maternal blood as would be entitled to the same had such illegitimate person been legitimate and died leaving no collateral kindred of the paternal blood." Acts 1855–6, pp. 227, 228. In 1859 a law was passed amending "the law of descent, in cases of persons who are illegitimate, or born out of lawful wedlock, dying intestate." It provided as follows: "When any person who is illegitimate or born out of wedlock, and who has never been legitimatized, shall die intestate, leaving no widow, or child, or children, or descendants of a child or children, and shall leave surviving a brother or sister, or brothers and sisters, of like illegitimate birth, and born of the same mother of such intestate, or descendants of such brother or sister,

or brothers and sisters, and their said descendants shall be entitled to, and inherit the estate real or personal of such intestate, under the same rules and regulations as if said intestate and said brother or sister, or brothers or sisters, were born in lawful wedlock. . . If such intestate shall die leaving no widow, or child or children, or descendants of a child or children, or brother or sister so born as hereinbefore mentioned, no descendants of such brother or sister, but shall leave a brother or sister, or brothers or sisters, born of the mother of such intestate in lawful wedlock, or descendants of such last-mentioned brother or sister or brothers and sisters, then and in that event, such last-mentioned brother or sister, or brothers and sisters, and their descendants shall be entitled to and inherit the estate of such intestate, under the same rules and regulations as if they were in law the next of kin of such intestate." Acts 1859, p. 36.

The provisions of the different statutes above referred to, relating to bastards, were incorporated in the Code of 1863 in the following language: "§ 1751. Bastards have no inheritable blood except that given to them by express law; they may inherit from their mother and from each other, children of the same mother, in the same manner as if legitimate. If a mother have both legitimate and illegitimate children, they shall inherit alike the estate of the mother. If a bastard dies leaving no issue or widow, his mother, brothers and sisters shall inherit his estate equally. In distributions under this law the children of a deceased bastard shall represent the deceased parent." "§1752. If a bastard dies intestate, leaving no widow or lineal descendant, or illegitimate brother or sister, or descendant of a brother or sister or mother, but shall leave a brother or sister of legitimate blood, such brother or sister, or descendant of such brother or sister, may inherit the estate of such intestate," Section 1751 of the Code of 1863 appears in the Code of 1895 in the same language. Civil Code, § 2510. Section 1752 as amended by the act of 1865 appears in the Code of 1895 in the following language: "If a bastard dies intestate, leaving no widow or lineal descendant, or illegitimate brother or sister, or mother, but shall leave a brother or sister

of legitimate blood, such brother or sister, or descendant of such brother or sister, may inherit the estate of such intestate; but in default of any such person, the brothers and sisters of the mother of such bastard or their descendants, or the maternal grandparents of such bastard, may inherit the estate of such bastard, to be divided amongst said persons in accordance with the degrees of consanguinity prescribed in the laws for the distribution of other estates." Civil Code, § 2511; Acts 1864–5, p. 102.

Under the law of this State a bastard has inheritable blood to the extent provided in the statutes above referred to. He can take as heir by descent from his mother and she from him, and in like capacity he may inherit from his mother generally with legitimate children. He may also inherit from an illegitimate brother or sister; and illegitimate brothers or sisters, or their descendants, may inherit from him. In certain instances, upon failure of heirs of the illegitimate line, the brother or sister of the legitimate blood, or their descendants, may inherit from him, and even the maternal grandparents of the bastard may inherit his estate. Such is the relation which under the law of this State the bastard bears to the mother and those persons related to him through her. The relation which the father bears to the bastard under the laws of this State is to be found in the declarations, that the father of a bastard is bound to maintain him; that he may voluntarily discharge this duty, but that if he fails or refuses to do so, the law will compel him. The father of an illegitimate child may render the same legitimate by appropriate proceedings in the superior court. Civil Code, §§ 2494, 2508. It will thus be seen that the bastard is recognized as an heir of the mother and of the issue of the mother, and that those who are in certain degrees of consanguinity to him may be his heirs; but as to the father, the relation of a bastard who has never been legitimated is the same as it was at common law — he can not inherit from the father, nor are the descendants or relations of the father under any circumstances his heirs. The legal status of the bastard has changed from time to time in this State, as is seen by the statutes above referred to, and it may be well in the present

investigation to examine the decisions of this court in reference to the matter.

In the case of *Edmondson* v. *Dyson*, 7 *Ga.* 512, it was held, where an act of the General Assembly declared, "That the name of Sarah Jane Wells be changed to the name of Sarah Jane Rakestraw, and that she be declared legitimate, and capable of inheriting, and like privileges in law as if she had been born in lawful wedlock," "that inasmuch as the illegitimate child was not, by the act, made legitimate to any *particular person*, the only effect of it was to change her name"; and hence that she could not take under a will which bequeathed certain property to the "heir or heirs at law" of Gainham L. Rakestraw, her reputed father.   In *Beall* v. *Beall*, 8 *Ga.* 210, the question was raised as to whether the General Assembly of Georgia possessed the power by a special act to legitimate a bastard child; and it was there held, that as under the common law the British Parliament could pass such an act, and as there was nothing in the written constitution of this State to deprive the General Assembly of the power, it still resided there.   Since the Code of 1863 the power to legitimate bastards has been vested in the courts.   Code of 1863, § 1738; Civil Code, § 2494.   In *Allen* v. *Donaldson*, 12 *Ga.* 332, decided in 1852, it was held:   "When there are two sets of children, born of the same mother, the one legitimate and the other illegitimate, and one of the latter dies intestate and without issue, the legitimate brothers and sisters on the maternal side are not, by the statutes of this State, codistributees of the estate of the deceased, with the illegitimates." The radical changes which had been made in the law in reference to bastards up to the time of this decision are thus alluded to by Judge Lumpkin:   "We acknowledge that there is an increasing liberality evinced in modern legislation, in favor of illegitimates.   And we rejoice that it is so.   This is shown by the act of 1829, which provides that lands drawn by illegitimates who have been returned as *orphans* should not be considered as fraudulent, but the same was declared to vest in them.   But it does not occur to this court that we should be advancing this policy by holding that legitimates should come

in and share the inheritance of an illegitimate with the coil-legitimates, while the privilege was not reciprocated.   We do not understand, in the language of our brother Peeples, how legitimates can be of kin to the illegitimates, but the illegitimates, at the same time, not of kin to them.   It is counsel, and not the court, who erect the wall between these *uterine* brethren, and maintain that the legitimates may leap over this wall and feed in common on the wild pasturage of the illegitimates—but while they deny to the latter the privilege of returning with them and partaking of their green meadows.   It would be a good law, perhaps, to enable each to inherit from the other, where there were no others occupying the same status, in preference to allowing the property to vest, under our statute of distribution, in distant collateral relations, or to escheat to the State, for want of heirs capable of inheriting."

*Shelton* v. *Wright*, 25 *Ga.* 636, decides that "An illegitimate child *fully* legitimated by an act of the legislature, passed by the procurement of the putative father, becomes his lawful child, and such child and his lawful children, upon the death of either, inherit from each other."   Judge McCay in *Houston* v. *Davidson*, 45 *Ga.* 574, thus declares the law of Georgia in reference to the capacity of bastards to inherit: "The progress of civilization and the spread of correct ideas has now almost obliterated the old notion that illegitimates are outcasts.   They do not inherit from the father, because the marriage tie—the proof that they are his children—does not exist between him and the mother.   But no such proof being needed as to their connection by blood with the mother, or with the brothers and sisters of her womb, they inherit.   It is in Georgia, now, only a question of *legal* proof of blood connection, since now legitimates and illegitimates inherit equally from the mother, and a legitimate brother or sister may, in some cases, inherit from an illegitimate.   .   .   So the marriage of the parents legitimates the children born before.   .   .   The whole spirit of our law is to put them on the same footing of legitimates, as to their mother and the children of her womb.   We hold, therefore, that the act of 1859, extending the principle of representation among collaterals to the grandchildren of brothers

and sisters, extends to the case where the estate for distribution is the estate of an illegitimate." The decision in *Langmade* v. *Tuggle*, 78 *Ga.* 770, was simply declaratory of the law that the mother was an heir of her bastard son. *Hicks* v. *Smith*, 94 *Ga.* 809, decides that an order of the superior court legitimating a bastard on the application of the father makes such bastard capable of taking by descent from his father only, and that he is not, by virtue of such order, enabled to take as the heir of the ancestors of the father. In *Floyd* v. *Floyd*, 97 *Ga.* 124, it was held, that "The term 'child,' as employed in section 2664 of the code, does not include a bastard so as to entitle him to the benefits of its provisions, and the conclusive presumption of a gift resulting from continuous. possession, under the circumstances therein set forth, arises only in favor of legitimate children."

Florence Barclay Johnstone is therefore undoubtedly an heir of his mother, Mary M. Barclay, and as such is entitled to inherit with her other children any property which she may have owned at the time of her death and which would go to her heirs at law upon her demise. But the property in controversy was not vested in Mary M. Barclay in such a way as to be transmissible to her heirs at law. Those who take this property after her death must take as purchasers under the trust deed; and therefore the question to be determined is, whether the plaintiff is a child of Mary M. Barclay within the meaning of that term as it was used by Mrs. Marshall. In other words, was it the intention of Mrs. Marshall when she signed the paper purporting to be a will, and when she afterwards incorporated it in the deed, that the provisions of that paper should be broad enough to embrace within the reach of the benefits therein provided for the illegitimate offspring of Mary M. Barclay, brought into life more than three years after the date of the deed so made? Was it in contemplation of Mrs. Marshall when she made this deed that the child who was undoubtedly the object of her great affection should come to disgrace and have born to her a child out of lawful wedlock? A casual reading of the deed, with its provisions with reference to the care and attention which were to be given to Mary M. Barclay in

her rearing and education, is all that is necessary to sufficiently demonstrate that this result was not only not contemplated by Mrs. Marshall, but would have been almost the last thing that would have occurred to her mind. No mother could have been more tender and solicitous about the future of her own child than Mrs. Marshall evidently was about the future of this girl. That the effect of holding that the plaintiff can not take any interest in the property in controversy under the terms of the deed would be adding sorrows to the life of one already unfortunate and desolate can not weigh with us in determining what the language of this deed means. We are irresistibly forced to the conclusion that the plaintiff can not take any interest whatever under this deed as the child of Mary M. Barclay, and that the meaning of the word child can not be enlarged so as embrace him, notwithstanding the use of the word issue in another part of the deed. The words *children* and *issue* in deeds, wills, and other conveyances must be held to mean legitimate children or issue, unless the context is such as to require a different meaning, or the circumstances surrounding the execution of the paper are such as to make the words import other than legitimates. The conclusion reached by us in this case is, we think, not only essentially correct, but the same is supported by the great weight of authority. Indeed we have been unable to find any case which is entirely irreconcilable therewith. A number of cases are cited on the briefs of counsel for both parties. Those which seem to be more nearly in point will now be considered, and we think we will be able to demonstrate that those which seem to be antagonistic to the view we have taken are in fact distinguishable from the present case.

In the case of Cartwright *v.* Vawdry, 5 Ves. Jr. 530, Lord Chancellor Loughborough says: "It is impossible in a court of justice to hold, that an illegitimate child can take equally with lawful children, upon a devise to children." And this was in a case where the illegitimate thus excluded was one born before the marriage of the parents and at the time of the making of the will was a member of the testator's household with his children born after marriage. A similar ruling was made in the case of Godfrey *v.* Davis, 6 Ves. Jr. 43. See also

Durrant *v.* Friend, 11 Eng. L. & E. Rep. 2. A testator bequeathed property to his son T., who was an illegitimate, and directed a division of his estate into seven parts, one of which was given to his widow for life, and after her death to "such of his children to whom the other six shares were given." As to those six shares, the direction was to pay them "among all my children living at my decease, except my son T." The testator left seven children, two of whom (T. and A.) were illegitimate; and it was held that A. was not entitled to a share as one of the testator's children; the vice-chancellor saying: "There is no such *designatio personæ* as to enable me to say that *Ann*, being illegitimate, is entitled to share with legitimate children of the testator in a gift to his children, nor does the exception of *Thomas* raise a necessary implication that *Ann* is to take as one of the testator's children." *In re* Wells' estate, 6 Eq. Cas. 599. See also *In re* Ayles' Trusts, 1 Chan. Div. (L. R.) 282; Ellis *v.* Houstoun, 10 Ibid. 236; Megson *v.* Hindle, 15 Ibid. 198. The rule laid down in the cases just cited was recognized by the Court of Appeals of South Carolina in Shearman *v.* Angel, 1 Bailey's Eq. 351, s. c. 23 Am. Dec. 166. In that case the will of the testator contained the following items: "I give, devise, and bequeath to my beloved mother, Mrs. Elizabeth Shearman, a part of my plantation on John's Island [describing it], which said parcel of land I give to my said mother during her life, and at her decease to her children, forever. Also, I give, devise, and bequeath to my said mother, . . the following negro slaves [naming them], together with their issue, to her, my said mother, during her life, and at her decease to her children forever. Also I give and bequeath to my said mother [certain personal property]; to her, my said mother, and her children, forever." The remainder of the testator's property, after bequeathing certain sums of money to several slaves whom he desired emancipated, was devised to his sister Martha Angel, and her husband Justus Angel. The testator and Martha Angel were the natural children of Mrs. Shearman, then Miss Tucker, and Isaac Waight, from whom the testator derived his estate. The complainants were the legitimate children of

Mrs. Shearman by a subsequent marriage, and they claimed the whole of the real estate and personal property devised to Mrs. Shearman, she having died, by virtue of the express limitation to her *children.* The chancellor decreed that they were so entitled; holding that the illegitimate sister of the testator was not one of the *children* of their mother in the sense in which that word was used in the will. Upon appeal this decision was affirmed. The ruling in the case just cited goes much further than it is necessary for us to go in the present case, and it is evidence of how tenaciously the courts cling to the idea that the word child shall always convey to the mind that a legitimate is being dealt with, and that it is incumbent upon any one who desires to give to this word any other than its well-known meaning to show that such was the intention of the person who used the language.

In Massachusetts it was held that the word children did not embrace illegitimate children in an act which provided that, "When any testator shall omit to provide in his will for any of his children, or for the issue of any deceased child, they shall take the same share of his estate, both real and personal, that they would have been entitled to if he had died intestate; unless they shall have been provided for by the testator in his lifetime; or unless it shall appear that such omission was intentional, and not occasioned by any mistake or accident." And this too notwithstanding the fact that there was a statute which declared that an illegitimate child should be considered as an heir of its mother and inherit from her estate. Thomas, J., in the opinion thus states the conclusion reached: "As at the common law illegitimate children have no rights of inheritance or descent, whatever they take is by force of the statutes. The statutes have provided for cases of inheritance, for the descent of intestate estates. They have made no provision for cases where there is an omission by a testator to provide in his will for an illegitimate child. Whether the same reasons apply to the case of an omission of an illegitimate child, and the same results should follow such omission, is a question for the legislature, and not for the court. Kent *v.* Barker, 2 Gray, 535. In Illinois it was held that prima facie the term children means

lawful children, and that a statute of descents by which the property of an intestate is made to descend to and among children and their descendants has reference to lawful children only, and does not do away with the common-law rule which prevents illegitimate children from inheriting. Blacklaws *v.* Milne, 82 Ill. 505, s. c. 25 Am. Rep. 339. In North Carolina it was held that the word children per se imports in law legitimate children, and none but legitimate children can be understood as embraced in an instrument providing for "children" unless it manifestly appear that natural children were thereby intended; and that this meaning of the word children was not at all altered by an act of the legislature of that State which permits, where a woman dies intestate and without legitimate children, "those commonly called illegitimate or natural children" to succeed to the property of their mother. They are not thereby made in law the children of their reputed mother, but only enabled to take her property where there are none such under the description above quoted. The facts of the case in which this ruling was made were, that John Charteris bequeathed all of his property to his two sisters, Jane McDonald and Ann Charteris, with the express limitation that if either of them should die without having a child or children living at her death, the survivor should take the property. Ann Charteris died without having been married, but leaving a daughter born out of lawful wedlock long before the execution of John Charteris's will. It was held that Jane McDonald took the entire estate of the testator. Thompson *v.* McDonald, 2 Dev. & B. Eq. 463. In the same State it was held that the word *issue* in a will which contained a clause bequeathing certain property to a daughter, to which was added these words: "which I intend for the said Ann or her issue," did not embrace illegitimate issue, although the daughter had such illegitimate issue at the time the will was made, and died without having legitimate issue. Doggett *v.* Moseley, 7 Jones, 587. See also Kirkpatrick *v.* Rogers, 6 Ired. Eq. 130. In Pennsylvania it has been held that the effect of statutes regulating the right of bastards to inherit, similar to those which have been passed in this State, did not legitimate illegitimate children, but only gave

the child and mother capacity to inherit from each other. Grubb's App. 58 Pa. St. 55; Neil's App. 92 Pa. St. 193.

In New Jersey the rule is thus stated: "Under a devise or bequest to 'children,' as a class, natural children are not included, unless the testator's intention to include them is manifest, either by express designation or necessary implication. All the cases cited in support of the claim of the illegitimate children will be found to fall within this principle. Illegitimate children may take under the general description of children; but it must appear unequivocally, from other parts of the will, that such was the testator's intention. The natural and legal import of the term children is legitimate children. To overcome this presumption, and to extend or alter the legal import of the term, the testator's intention must be manifest. The residuary clause of the will in question, under which the children of Mary Heater claim title, contains no express designation, by name or otherwise, of her illegitimate children. The testator's intention to include them in that devise, if it exist, must appear by necessary implication from other parts of the will." In this case the testator gave the residue of his estate to his stepdaughter, Mary Heater. At the time of the devise and at the death of the testator she had two children born before her marriage and two legitimate children born after her marriage. After the death of the testator she had six other children born in wedlock, one of whom, Sarah Casterline, died in the lifetime of her mother, leaving issue five children. Mary Heater at her death left nine children, two of whom were illegitimate, and five grandchildren, the children of a deceased daughter. Heater *v.* Van Auken, 14 N. J. Eq. 159. In New York the rule has been thus stated: "Where there are legitimate children in existence at the time of making the will, so as to satisfy the words of the devise or bequest in their primary sense, an illegitimate child can not take under a general devise or bequest to children, as a class, unless there is something else appearing in the will to show that the testator intended to include others besides legitimate children." Collins *v.* Hoxie, 9 Paige Ch. 81. In Cromer *v.* Pinckney (N. Y.), 3 Barb. Ch. 466, Chancellor Walworth uses this language: "As a general

rule, in the construction of wills, the testator must be presumed to have used words in their ordinary or primary sense and meaning; unless from the context of the will it appears that he must have intended to use them in some other, or secondary sense; or where by reference to extrinsic circumstances which existed at the time of making of the will, or which must necessarily exist in the event or at the time contemplated by him, the use of such words in their ordinary, or primary sense, would render the provision of the will in reference to which such words were used insensible, absurd, or inoperative. Thus the word children, in its primary and ordinary sense, means the immediate legitimate descendants of the person named. And where there is nothing to show that the testator intended to use it in a different sense, it will not be held to include illegitimate offspring, stepchildren, children by marriage only, grandchildren, or more remote descendants." In Maine it has been held that a statute declaring under what circumstances an illegitimate might take property by inheritance or descent would not have the effect of requiring words in a will, which would ordinarily refer to legitimates only, to be so construed as to allow illegitimates to take by purchase under the will. Lyon v. Lyon (Me.), 34 Atl. 180. In the case of Flora v. Anderson, 67 Fed. 182, it was held that a devise to issue meant, prima facie, legitimate issue, and that an intention to include illegitimate issue must be deduced from the language itself without resort to extrinsic evidence. The same case being before the circuit court of the United States in the southern district of Ohio the second time, a ruling was made that the Ohio statute of descents, which permitted bastards to inherit and transmit inheritances on the part of their mothers, did not enable an illegitimate child of a woman to take under a devise of a remainder to the issue of the body of such woman. Flora v. Anderson, 75 Fed. 217.

We will now proceed to a consideration of some of the cases relied on by the plaintiff in error. The case of Bennett v. Toler (Va.), 15 Gratt. 588, s. c. 78 Am. D. 638, seems to have been confidently relied on as controlling, in principle, the question under consideration in the present case. Upon a close examination of the facts of that case we can not see that

the decision is really in conflict with the ruling made in the present case. Joseph Toler gave to his daughter Mary Bennett the land on which she lived; also certain slaves, the clause of the will concluding in these words: "My will is, at the death of my daughter Mary Bennett, that the land and negroes given to her shall be equally divided amongst her children." At the testator's death his daughter was married to Lewis Bennett, by whom she had several legitimate children. Previous to her marriage she gave birth to an illegitimate child by another man. This illegitimate was known and recognized by the testator as his daughter's son. When the testator died the legitimate children and the bastard were all living. The question was, whether the illegitimate child took an interest equally with the lawful children of Mary Bennett under their grandfather's will. While the reasoning of Allen, P., seems to lead to the conclusion that, had it been necessary, the court would have gone to the extent of holding that an illegitimate child not in life at the time the will was made would have taken under the devise to children in the will under consideration in that case, the ruling made, when considered in connection with the fact that the bastard was born several years before the will was made and was recognized by the testator as his daughter's child, is not authority for the construction sought to be given the word children in the deed under consideration in the present case. In the case of Howell v. Tyler, 91 N. C. 207, the court had under consideration a will which provided that "What is yet remaining, not above disposed of, shall be held and disposed of, for the benefit of Martha J. Trevan's heirs, by my executor hereafter to be named, or in such manner as he may think just and proper." Martha Trevan had no legitimate children, and it was held that under the word heirs her illegitimate children would take under this will; the court saying: "Inasmuch as, in the absence of children born to the mother in wedlock, those of illegitimate birth can inherit from the mother and thus become her heirs, these plaintiffs are sufficiently designated by the term which describes that relation." In that case it appeared that the testator knew that Martha J. Trevan had both legitimate and illegitimate children. In Drummond v. Leigh, 30 Ch. Div. 110, an

illegitimate was allowed to take under a will which made provision for "all and every the children and child" of a designated person, because it was clear and manifest from the terms of the will that the testator so intended; the vice-chancellor concluding his opinion in the following words: "Here I am satisfied the testator did intend that his nephew's daughter, whom he knew to be illegitimate, was to be treated, for the purposes of his will, as if she was legitimate."

In Dickerson's Appeal, 42 Conn. 491, it was simply ruled that under the law of Connecticut a bastard has inheritable blood for the purposes of collateral as well as lineal descent through him. Whether he could take as purchaser under a will or deed using the word children was not a question considered at all in that case. In Hughes v. Knowlton, 37 Conn. 429, the court had under consideration a will which contained a clause devising real estate to two daughters, "meaning and intending that all the children that have been or may be born of their bodies shall become heirs to the same." Each of these daughters had illegitimate children in life at the time the will was made. It was held that under the law of Connecticut this will gave to the daughters a fee-simple estate; and therefore the question as to whether the illegitimates would take under the language quoted was not passed upon by the court. The ruling made by the Supreme Court of California in the Matter of the Estate of Wardell, 57 Cal. 484, is entirely consistent, we think, with what is ruled in the present case. A California statute provided that, "When any testator omits to provide in his will for any of his children, or for the issue of any deceased child, unless it appears that such omission was intentional, such child, or the issue of such child, must have the same share in the estate of the testator as if he had died intestate." Another statute declared that "Every illegitimate child is, in all cases, an heir of his mother, and inherits her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock." Ada Wardell died testate, leaving a husband, two sons, and a daughter. No provision was made in the will for the daughter. Her name was not mentioned in it, but it does not appear from anything in the will itself that the omission was intentional. The daughter was

born out of lawful wedlock, and had never been legitimated in any way authorized by the law of California. It was held that under the statute first above quoted she was entitled to a share in the estate in like manner as if she were legitimate. The statute last quoted made her an heir of her mother; and being such heir, she was a child of her mother within the meaning of the other statute, so as to allow her to claim that she had not been intentionally omitted from the will of her mother. Construing the two statutes together, the result reached by the court in that case was undoubtedly correct. In the case of a devise by a mother to children generally, her illegitimate issue recognized by her as her children would certainly take, unless the contrary intention on the part of the testatrix was clearly manifested in the will. Under the California law, the question under consideration was the same as if the mother had devised her property to her children generally. The statute in this State allowing a bastard to inherit from his mother, while throwing but little light on the question of the intention of a person who devised property to a woman, with remainder to her children, would certainly have great weight with the courts in construing a will made by the mother herself. On account of the natural affection which mothers bear to their offspring, it would take a strong case to authorize the exclusion of illegitimate children of a mother from participating in property devised by her to her children.

We have examined practically all of the cases cited in the very able and elaborate briefs of counsel in this case. We have referred to such as we believe required special attention in dealing with the case. The conclusion reached by us is supported by an almost unbroken line of authorities. The case must at last be decided upon what was the intention of Mrs. Marshall when she made the deed of trust. What she might have done for this unfortunate plaintiff if the deed or will had been made after he came into existence we do not know; but that it was not her intention by the language used in the deed to provide for those of the class to which he belongs hardly admits of doubt.

*Judgment affirmed. All the Justices concurring, except Lewis, J., who was disqualified.*