JOHN MILLER and others *vs.* GEORGE C. EWING.

In a deed, whereby the grantors " remise, release, grant, bargain, sell, and forever quitclaim " to the grantee certain land described, together with all the estate, right, title, interest, use, property, claim, and demand which the grantors now have, or at any time heretofore had, of, in, or to, the premises, these words, " to have and to hold all the aforegranted and bargained premises to the grantee, his heirs and assigns forever, so that neither we, the grantors, nor our heirs, nor any other person or persons claiming from or under us or them, or in the name, right, or stead of us or them, shall or will, by any way or means, have, claim, challenge, or demand any estate, right, title, or interest, of, in and to the aforesaid premises, or any part or parcel thereof forever," are a good covenant of warranty against

the grantors and their heirs and other persons claiming under them, to the extent of the estate and interest then belonging to the grantors, but do not estop them from setting up a new and distinct title afterwards acquired to the same land.

A reversioner is not bound to enter immediately, for a disseizin of, or forfeiture by, the tenant for life, but a new right of entry accrues on the death of such tenant, and the statute of limitations begins to run against the reversioner from that time, how long soever the tenant for life may have been disseized.

THIS was a writ of entry, brought by John Miller, Joel Miller, Abner Miller, Charles Ball, Edwin H. Ball, and Nathaniel Thorp and Elizabeth Thorp, his wife, in her right, to recover sixteen one hundred and seventy-fifth parts of a lot of land in Holyoke, formerly part of West Springfield, in the county of Hampden. The writ bears date the 16th of April, 1850.

The case was submitted to the court upon the following statement of facts : —

Lieutenant John Miller died intestate in 1792, seized of a large estate, of which the demanded premises were parcel, leaving a widow, Lucretia, and five children, John, Abner, Asaph, Merab, wife of Charles Ball, and Hepzibah, wife of Jedediah Day.

The widow's dower was assigned and set off to her by metes and bounds in due course of law, including the premises demanded in this action ; and the residue of the estate was distributed among the heirs. The widow, after the death of lieutenant Miller, married one Barnes, and she and her second husband, at some time before the year 1806, in consideration of forty dollars each paid by John Miller, Abner Miller, Asaph Miller, Charles Ball, and Jedediah Day, agreed to relinquish to them her right of dower, but it did not appear that any written conveyance thereof was ever made by her and her husband. She died in 1833.

On the 13th of March, 1806, the heirs of lieutenant Miller made a division by deeds of all the lands set off to Lucretia Miller for her dower. One fifth was conveyed to each of the sons to hold in severalty, and the remaining two fifths, embracing the demanded premises, were conveyed by the three sons to Jedediah Day and Charles Ball, by a deed in the following terms : —

" Know all men by these presents, that we, John Miller, Abner Miller, Asaph

*Miller & others v. Ewing.*

Miller, of West Springfield, county of Hampshire, and state of Massachusetts, in consideration of one thousand dollars paid by Jedediah Day and Charles Ball, the receipt whereof we do hereby acknowledge, and for divers other good causes and considerations us hereunto moving, do for ourselves and our heirs, remise, release, grant, bargain, sell, and forever quitclaim unto the said Jedediah and Charles, their heirs and assigns, certain lands in West Springfield third parish, it being part of the real estate of Lt. John Miller, deceased, that was set out unto the widow as thirds, [then follows the description,] together with all the estate, right, title, interest, use, property, claim, and demand whatsoever of us the said John, Abner, and Asaph, which we now have, or at any time heretofore had, of, in, or to the aforementioned premises, with the appurtenances, or to any part thereof, or which at any time heretofore has been held, used, occupied, or enjoyed as part or parcel of the same, to have and to hold all the aforegranted and bargained premises, with the appurtenances, to them the said Jedediah and Charles, their heirs and assigns forever, with the reversion and reversions, remainder and remainders thereof, or any part or parcel thereof forever, so that neither we the said John, Abner, Asaph, nor our heirs, nor any other person or persons claiming from or under us or them, or in the name, right, or stead of us or them, shall or will, by any way or means, have, claim, challenge, or demand any estate, right, title, or interest of, in and to the aforesaid premises, with the appurtenances, or any part or parcel thereof, forever. In witness whereof," &c.

On the 3d of May, 1819, Charles Ball and wife conveyed all their right, title, interest, and estate in the demanded premises to Jedediah Day, by a quitclaim deed, the *habendum* in which was precisely similar in form to that inserted in the deed of March 13th, 1806, from John, Abner, and Asaph Miller to Day and Ball.

Hepzibah Day died on the 25th of November, 1823, never having had children.

Abner Miller died in 1829, having previously, in 1824, conveyed his interest in the demanded premises to his son Abner, one of the demandants in this action.

John Miller died in 1836, leaving seven children, or their representatives, three of which children are the demandants, John Miller, Joel Miller, and Elizabeth Thorp.

Charles Ball and Merab his wife died in 1838, leaving children, Charles and Edwin H., demandants in this action, and three others.

Jedediah Day, from the 3d of May, 1819, to the time of his death, had open and sole occupation of the demanded premises, considering himself to have the exclusive right thereto, and sold a small portion thereof. He died in 1839, having

devised the remainder of the premises to Jedediah, his son by a second marriage, by a will which was duly proved; and Jedediah, the son, continued to occupy the same until October, 1849, when he conveyed the same by deed of warranty to the tenant, who has ever since held it.

The demanded premises consist of a single lot, which has been inclosed and cultivated ever since 1819.

It was agreed that the court might draw any inference that a jury might draw from the above-stated facts, and render judgment thereupon.

*H. Morris* and *E. L. Miller,* for the demandants, to the point that there had been no disseisin of the demandants, cited *Gould* v. *Thompson,* 4 Met. 224; *Tilson* v. *Thompson,* 10 Pick. 359; *Wells* v. *Prince,* 9 Mass. 508; *Wallingford* v. *Hearl,* 15 Mass. 471; *Marcy* v. *Marcy,* 6 Met. 360, 370; *Liscomb* v. *Root,* 8 Pick. 376; *Parker* v. *Locks and Canals,* 3 Met. 91; *Ricard* v. *Williams,* 7 Wheat. 59, 121; *Higbee* v. *Rice,* 5 Mass. 344, 351.

*R. A. Chapman* and *W. G. Bates,* for the tenant.

1. The demandants are estopped by the deeds of John Miller and others to Day and Ball of March 13th, 1806, and of Ball and wife to Day of May 3d, 1819, to claim the demanded premises. *Trull* v. *Eastman,* 3 Met. 121; *Fairbanks* v. *Williamson,* 7 Greenl. 96; *Blanchard* v. *Brooks,* 12 Pick. 47, 66; *Comstock* v. *Smith,* 13 Pick. 116; 2 Smith, L. C. (3d Am. ed.) 507, 511, note to *Duchess of Kingston's case.* [*Hubbard* v. *Apthorp,* 3 Cush. 419; *Loomis* v. *Bedel,* 11 N. H. 74.]

2. The tenant is entitled to the land by the open and adverse possession for twenty-seven years of himself and those under whom he claims. *Parker* v. *Locks and Canals,* 3 Met. 91.

*Morris,* in reply.

The deed of 1806, taken altogether, is only a conveyance of the right, title, and interest which the grantors then had, and the covenant cannot extend beyond the premises conveyed. The case of *Trull* v. *Eastman* was a conveyance of a mere expectancy.

SHAW, C. J.   The demandants claim sixteen one hundred and seventy-fifth parts of the land described in the writ, as heirs at law of Hepzibah Day, wife of Jedediah Day, and daughter of lieutenant John Miller, deceased.   A large estate, of which the demanded premises are parcel, belonged to lieutenant John Miller, who died in 1792, seized intestate, leaving a widow, Lucretia, and five children ; three sons, John, Abner, and Asaph, and two daughters, Merab, wife of Charles Ball, and Hepzibah, wife of Jedediah Day.

The widow's dower was assigned and set out to her by metes and bounds in due course of law, and the residue was distributed amongst the five heirs.   The question now relates to that which was set off to the widow as dower.

By this assignment, the widow acquired a freehold in the estate set off to her, being an estate for her own life, and the sons and daughters took a reversion, each of one fifth, of the land thus assigned in dower, expectant upon the termination of the widow's estate for life.

It is contended, that this life estate was surrendered, abandoned, or relinquished, by an agreement made before 1806, by the life tenant, who had intermarried with one Barnes, by which, in consideration of forty dollars paid by each of the three sons, and the husbands of the two daughters, she agreed to relinquish to them her right of dower ; but no written conveyance was made by her of her interest in the land.   This could not amount to an extinguishment or merger of the life estate, because by the statute, every surrender, as well as every assignment or grant of any interest in lands, must be made by deed or note in writing.   *St.* 1783, *c.* 37, § 1.   Her life estate therefore continued until 1833, when she died.

Hepzibah Day died in 1823, never having had any children, and the question is, whether by alienation, disseisin, estoppel, or otherwise, her one fifth of this reversion was divested, or whether it descended to her collateral heirs.   In 1806, a division was made amongst the five reversioners by deed, to hold in severalty, except that the conveyance to Ball and Day by John, Abner, and Asaph, was to hold two fifths in common, and also except that, though Ball and Day held in right of

their wives, yet the conveyance by the three brothers was made to them and not to their wives. [See deed of 13th of March, 1806, *ante* p. 36.] The demanded premises fall within the part thus set to Ball and Day, as tenants in common.

The part of the dower estate thus released by John, Abner, and Asaph, was held three tenths to Ball and Day each in their own right, by the last conveyance, and one fifth to each of them and their respective wives, in right of the wives.

In 1819, Ball and wife conveyed their share and interest in the same to Jedediah Day, in fee. Then, Day held the whole of the reversion in the dower estate, four fifths in fee, in his own right, and one fifth in right of his wife, during his and her joint lives. Having had no child born, he was not tenant by the curtesy.

What then prevented the heirs at law of Hepzibah Day from taking the estate? It was an estate in expectancy, depending on the termination of the life of the widow, who survived till 1833. But it was a vested estate, and would pass by descent. It is stated in the argument, though I believe it does not appear in the report, that Hepzibah Day's three brothers, John, Abner, and Asaph, and her sister Merab Ball, were all then living. If so, they took one fourth each of Hepzibah Day's one fifth of the dower estate. If either was dead leaving children living, such children would take, by right of representation, the one share which the deceased parent would have taken, under the rule, which allows the right of collaterals by representation to the degree of brothers' and sisters' children, but not further. If the sister or either of the brothers died, during the life of the tenant for life, the share of such heir would in like manner descend to his heirs. But we have not thought it necessary to ascertain minutely the shares of the several demandants; the great question is, whether they can claim any thing by descent from Hepzibah Day.

In defence of this claim, two grounds are taken : —

1. That by the deeds of Abner Miller, John Miller, and Asaph Miller, in 1806, to Ball and Day, and by the subsequent deed of Charles Ball and his wife to Jedediah Day, Day became entitled to the whole estate, comprising the widow's dower,

with special warranty against the grantors themselves, and all persons claiming under them, and that the demandants, being all heirs claiming under those grantors, are estopped by the warranty of their ancestors.  It is then said that Day, being thus seized of the estate, devised it to his son Jedediah, a son by a subsequent marriage, from whom by mesne conveyances, it came to Ewing the tenant.

We have examined those deeds; they are both quitclaim deeds, in the usual form, of all the grantor's right, title, and interest in the land, with the usual clause in the *habendum*, "so that neither I the grantor, nor any person claiming under me, shall have, claim," &c.   Such a clause is undoubtedly a good qualified warranty.   *Newcomb* v. *Presbrey*, 8 Met. 406 ; *Fairbanks* v. *Williamson*, 7 Greenl. 96 ; *Trull* v. *Eastman*, 3 Met. 121.   But to what does this warranty apply ?   Obviously to the premises, that is, the land, estate, or interest, whatever it be, which the deed, in its descriptive part, purports to convey. The principle is, that if any person, who, in terms conveys land or any specific interest in land, with warranty, and does not own it, afterwards acquires that same land or specific interest, such acquisition enures to the benefit of the grantee, because the grantor and those who are privy in estate with him are estopped to deny, against the terms of his warranty, that he had the title in question.   The warranty is coextensive with the estate, right, or interest, which the deed purports to pass. But such warranty does not apply to the present case.   John Miller and his brothers, when they conveyed to Ball and Day with warranty against themselves and their heirs, had an estate and interest derived by descent from their father, and to this, and this alone, both the grant and the warranty applied. So of Ball and wife, when they conveyed to Day.   But they did not purport to grant or warrant an estate, which they might at a future time derive by descent from their sister, Hepzibah Day.   They are therefore not estopped by that warranty, from claiming this estate by a new and distinct title.   *Blanchard* v. *Brooks*, 12 Pick. 47 ; *Comstock* v. *Smith*, 13 Pick. 116.   The case of *Trull* v. *Eastman*, cited by the defendant, is no authority for a contrary doctrine.   The deed in that case was a

conveyance, in terms, from one brother to another, of all the estate or interest which the grantor had or which might come to him by will or heirship, with the clause, "so that neither I," &c. There the premises, or interest conveyed, was a mere possibility, an expectancy; nothing passed by the conveyance; but it purported to convey a future interest to be acquired; and the warranty was held coextensive with the grant, and estopped the grantor, after the estate accrued, from demanding it. These grants did bind all the grantor's own four fifths of the reversion, but did not extend to the undivided fifth of Hepzibah Day, who never conveyed to anyboay ner original one fifth, which descended to her from her father.

2. The other ground is, that the tenant is entitled to the land by open and adverse possession, for twenty-seven years, by himself and those under whom he claims.

It is stated in the report, that Jedediah Day had the open and sole occupation from May, 1819, to his death in December, 1837. To 1823, he had possession, in right of his wife, of her one fifth, which is the subject of this controversy, and his possession was adverse to nobody. To 1833, the life estate of the widow continued, and the presumption is, that he held under her. If he did not, he was a wrongdoer as to her, but his possession was not necessarily adverse to the reversioners, and did not operate to disseize them, but at their election.

The right of entry of the reversioners accrued at the death of the tenant for life in 1833; and even though she may have forfeited her life estate by some previous act, so that the reversioners might have entered earlier; still they were not bound to do so, but had a right to enter then, how long soever the particular tenant might have been disseised; and the statute of limitations begins to run from that time. *Tilson* v. *Thompson*, 10 Pick. 359.

If, therefore, the tenant was at liberty to connect the adverse possession of Jedediah Day and that of his son Jedediah with his own, it would not make twenty years, from the time the right of entry accrued, and therefore the right of action is not barred by the statute of limitations.