FIDUCIARY TRUST COMPANY, trustee, *vs.* AIMEE HENRY
MISHOU & others.

Essex.    May 5, 1947. — September 19, 1947.

Present: QUA, C.J., LUMMUS, RONAN, & SPALDING, JJ.

*Power.  Rule against Perpetuities.  Devise and Legacy,* Power, Rule against
perpetuities, Intestacy, Issue.    *Trust,* Resulting trust, Reversion to
settlor, Trustee's accounts.   *Will,* Ratification by beneficiary.   *Elec-
tion.  Estoppel.  Res Judicata.  Laches.  Evidence,* Presumptions and
burden of proof.   *Executor and Administrator,* Appointive property,
Distribution.  *Exoneration.  Bastardy.  Words,* "Issue."

As applied in the case of an inter vivos trust executed by a wife before
she had any children, creating in her an interest in the income of
the trust property and a general power of appointment over the prin-
cipal by will only, and of her will giving the appointive property to a
trustee to pay the income thereof to her children who survived her or
their issue until the death of the last surviving child and then to dis-
tribute the principal to the children's issue, or, in default of such
issue, to the donee's sisters or their issue, the rule against perpetuities
made remote and invalid such remainder interests in the principal
given by the will, because, even in the light of facts uncertain when
the power was created but certain when it was exercised upon the
death of the donee, they might not finally vest in ascertained persons
within any life in being at the time of the creation of the power and
twenty-one years after such life.

The principle, that the period of the rule against perpetuities, as affecting
appointive property, must be measured from the time of the creation
of the power rather than from the time of its exercise, was applicable
where a power of appointment solely by will was created in a married
woman by an inter vivos trust established in 1851 by her and her hus-
band of personalty which had been her property before their marriage.

Interests in remainder in appointive principal established by the exercise
of a testamentary power of appointment were wholly withdrawn from
the operation of the instrument creating the power and became subject
to a resulting trust for the benefit of the estate of the donee, where it
appeared that the donee's will established a single trust of both her
own property and the appointive property and that the remainder
interests thereby erected in the principal were invalid under the rule
against perpetuities as to the appointive principal, and where there
were no circumstances which, taken in connection with an explicit
provision of the instrument creating the power for devolution of the
property in the event of its nonexercise, indicated an intent of the
donor that the donee should not appropriate the appointive principal
to her own estate.

Remainder interests, which a donee of a general testamentary power of appointment had attempted to create in the appointive property by the final provisions of the residuary clause of her will establishing a trust of that and her own property, but which were remote and invalid as to the appointive property under the rule against perpetuities and became assets of her estate by resulting trust, were not thereby subjected to the final provisions of the residuary clause, which were valid as applied to her own property, but passed as intestate property of her estate as though such final provisions had not been contained in the will.

Acceptance by a husband of legacies of articles of a highly personal character, given him in his wife's will with a statement that it was at his "own express request" that she made no further devise or bequest to him or for his benefit, did not constitute an election by him precluding him from taking also certain remainder interests in property over which, under the provisions of a trust created in 1851, she had a power of appointment that under the rule against perpetuities had been ineffectually exercised by her will as to such remainder interests, so that in the circumstances they became by resulting trust assets of her estate and passed as intestate property thereof to him as her sole distributee; nor did acceptance by the children of the testatrix and her husband of bequests in the will of valid life interests in the income of the appointive and other property constitute an election precluding them, upon the death of the husband many years later, from taking such remainder interests as beneficiaries under his will.

An instrument whereby a husband and his wife in 1851 conveyed property, which had been the wife's before their marriage, to a trustee to pay the income to the wife during the marriage, to pay the entire trust fund to her if she should survive her husband, or, if he should survive her, to dispose of the trust fund as she should appoint by her will, did not leave in her a reversionary interest in the trust property which would pass as such by her will and would be affected by the rule against perpetuities only as that rule affected her testamentary disposition of her own property, where the husband survived the wife and an attempt by her in her will fully to exercise her power of appointment by the provisions of a residuary clause creating a trust which included her own property and the appointive property was invalid under the rule against perpetuities as to remainder interests in the appointive property.

The adjudication and allowance of a testamentary trustee's accounts which, although they dealt with property appointed in trust by the testatrix under a general testamentary power of appointment and with her own property as a single trust fund during the existence of life interests valid as to both kinds of property, did not deal with the disposition of the principal of the trust, did not preclude interested parties, after the death of the last surviving life beneficiary, from contending that the disposition of the principal provided for in the will upon such death was invalid under the rule against perpetuities so far as the appointive property was concerned; nor were such parties precluded by laches from making the contention.

In connection with the distribution of the principal of a single testamentary trust fund composed originally, many years before, of both the testatrix's own property and property over which she had a general testamentary power of appointment, certain parties, claiming that the provisions in the will for the disposition of the principal were invalid as applied to the appointive property and that they were accordingly entitled to that property as against other parties who were given the entire principal of the trust under such provisions of the will, had the burden of proving what principal was derived from the appointive property.

Upon an appointment in trust under a general testamentary power of appointment which had the effect of removing the appointive property from the operation of the instrument creating the power but which was invalid under the rule against perpetuities with respect to disposition of the principal of the trust property and brought about a resulting trust of the principal to the estate of the donee, debts, expenses and legacies payable by the executor of the donee's will should not first be charged against the donee's own property in exoneration of the appointive property, but should be charged pro rata against both.

In the absence of anything to show the contrary, a gift in a Massachusetts will to the "issue" of the testatrix's children did not include an illegitimate child of a daughter of the testatrix.

Trust property adjudged to belong in distribution to the estate of one, who had died many years before and whose estate had long since been fully settled, might properly be ordered transferred, instead of to the legal representative of his estate, directly to the legal representatives of the estates of deceased persons who had been the beneficiaries under his will.

PETITION, filed in the Probate Court for the county of Essex on February 16, 1945.

The case was heard by *Phelan*, J.

*R. H. Wiswall*, stated the case.

*S. H. Babcock*, (*A. P. Lowell & G. M. Taylor, Jr.*, with him,) for the executor of the will of Mary Martha Taylor.

*C. M. Storey & W. B. Trafford*, for the executrix of the will of Charles T. Parker.

*V. Taylor*, administrator with the will annexed of James Parker, submitted a brief.

*P. J. Woodward*, (*A. H. Haussermann* with him,) for the administrator with the will annexed of Richard T. Parker.

*D. Schwartz* of the Federal Bar, (*C. J. Kalinauskas* with him,) for Attorney General of the United States.

*J. H. Cohen* of New York, (*H. P. Goldstein* with him,) for Aimee Henry Mishou.

*T. A. Henry*, for De Sartiges and another.

*H. L. Clark*, (*F. C. Underhay* with him,) for Christophersen and others.

QUA, C.J. This is a petition by the remaining trustee under the will of Martha S. Parker, late of Beverly, for instructions as to the distribution of the principal of a trust created by her will.

The testatrix died March 12, 1878. Her will was dated March 8, 1864. A codicil made in 1872 is not here material. In 1851 Martha S. Parker, the testatrix, married Richard T. Parker and immediately after the marriage, under date of October 2, 1851, she and her husband, as parties of the first part, entered into an indenture with James Parker, the elder of that name, party of the second part, in the nature of a marriage settlement, wherein the husband and wife conveyed to James certain property of the wife, who was then a minor, including all the personal property held by her guardian for her benefit and of which she or her husband was entitled to receive a transfer from her guardian. This conveyance was expressed by the indenture to be in trust to pay the income to the wife to her separate use during the marriage and to pay the entire fund to her if she should survive her husband, but if he should survive her, as actually happened, to dispose of the entire trust fund "as she, whether of full age or not, may have directed by any last will and testament in writing by her executed in the presence of three witnesses, or by any instrument of appointment by her so executed in the nature of a last will and testament, and in default of any such will or appointment," to pay the income to the husband, Richard T. Parker, during his life and at his death to dispose of the fund as he "may have directed by any such last will and testament or instrument of appointment in the nature thereof; and in default of any such will or appointment," then to the persons who would be the heirs at law of the wife if she had then died intestate and a widow.

Mrs. Parker by her will of 1864 attempted to dispose of all her property and estate "and of all property over which . . . [she had] any power of appointment, and especially"

of all property held in trust for her under the indenture of 1851 "over which property and estate by the terms of the said Indenture . . . [she had] a full and absolute power of appointment." She gave her husband, Richard T. Parker, a life estate in the family plate belonging to her, with remainders over after his decease. She also bequeathed to him her jewelry, and her articles of personal use and ornament and household furniture. She then bequeathed the residue of her estate, without any express distinction between property owned outright by her and property over which she had a power of appointment under the indenture of 1851, to trustees in trust to pay certain legacies and thereafter to make out of income certain payments for the use, support and education of her living children and when each should arrive at the age of twenty-one to pay him or her "yearly and in each year during life that portion of the said net income to which on an equal division of the same among all my children then living and the issue of any deceased child by right of representation, such child would be entitled . . . and from and after the decease of such child to pay the said share or portion [of income] to his or her issue living (if any) until the decease of my last surviving child and the division of the trust estate to be then made as hereinafter provided." The will then provided that upon the decease of the last surviving child the trustees should distribute the fund among the issue of the deceased children by right of representation, but that if no issue of any deceased child should be living at the decease of the last surviving child the fund should be distributed among the sisters of the testatrix then living and the issue of any deceased sister by right of representation, and if no sister or issue of a deceased sister should then be living to the testatrix's heirs at law. This is the trust with reference to which the petitioner as sole present trustee now seeks instruction. The testatrix named her husband, Richard T. Parker, as executor of her will. He assented in writing to the will and acted as executor.

Upon her death in 1878, the testatrix, Mrs. Parker, was survived by her husband, Richard T. Parker, and by her

three children, James Parker, the younger of that name, Charles T. Parker, and Mary Martha Parker (later Taylor). All three children had been born after the execution of the indenture of 1851. Charles T. Parker died in 1912, leaving no issue. James Parker the younger died in 1930, leaving no issue. Mary Martha Taylor died in 1943, leaving as her only surviving issue two illegitimate daughters, Aimee Henry Mishou and Martha Sakrausky. The testatrix's husband, Richard T. Parker, died in 1904, leaving a will wherein, after exercising in Article Five a power of appointment under his father's will (not here involved), he gave his residuary estate including "all property over which I may have any power of appointment other than given me in the will of my father, and exercised in Article Five of this will," to his three children James Parker (the younger), Charles T. Parker, and Mary Martha Parker (Taylor) in the proportions respectively of eleven undivided twentieths, three undivided twentieths, and six undivided twentieths. None of the sisters of the testatrix was living at the death of the testatrix's last surviving child (Mrs. Taylor in 1943), but certain of the sisters did leave issue then surviving.

The trust fund now in controversy was received in 1878 by the original trustees from the executor of the will of Mrs. Parker without distinction between property owned outright by Mrs. Parker and property derived by virtue of her exercise of her power of appointment under the indenture of 1851. The fund, during the period of the trust, has been administered "as one fund, no division or distinction having been made at any time with regard to the source of said property whether derived from property owned by the said Martha S. Parker in her own right or whether derived from said trust of October 2, 1851." At least the greater part of the original fund came from the 1851 trust and not from property owned outside that trust by the testatrix, Mrs. Parker. Some of the parties contend that all of the present fund is proceeds of the 1851 trust.

Facts in addition to those hereinbefore stated will be mentioned hereinafter as occasion requires.

There are three sets of claimants to the principal of the existing fund. They may be identified and the general nature of their claims may be summarized as follows: (1) The respective executors or administrators with the will annexed of the husband and of the three children of Mrs. Parker contend that the period of time within which, under the rule against perpetuities, future interests in property derived from the 1851 trust must vest is to be calculated from the creation of the 1851 trust from which the testatrix's power of appointment sprang and not from the attempted exercise of that power at the death of the testatrix in 1878; that the limitations in her will of principal after the death of the last survivor of her children (none of whom was a life in being in 1851) to the issue of those children and in the event of failure of such issue to the sisters of the testatrix or their issue are too remote; that to that extent there was a failure on Mrs. Parker's part to make a valid appointment under the 1851 indenture; that in default of such valid appointment the power of appointment given by the 1851 indenture to the husband, Richard T. Parker, became operative; that by his will he made a valid appointment under that power to the three children in the proportions hereinbefore mentioned; and therefore that the estates of these children are entitled to share in the principal of the trust fund under Mrs. Parker's will in those proportions in so far as that principal is derived from the 1851 trust fund. (2) Mrs. Mishou, an illegitimate daughter of Mrs. Parker's daughter Mary Martha Taylor, and the Attorney General of the United States as presently entitled to the share of Mrs. Sakrausky, the other illegitimate daughter, an alien enemy, contend that the time when future limitations must vest under the rule against perpetuities is to be calculated from the death of Mrs. Parker, who attempted to exercise her power, and not from the creation of the power in 1851; that the limitations of principal to the issue of Mrs. Parker's children at the death of the last survivor of such children, such children being lives in being at the death of Mrs. Parker, was not too remote but was valid; and that the illegitimate children were

"issue" of Mrs. Parker's daughter within the meaning of the word issue in the will and were entitled to take notwithstanding illegitimacy. The Attorney General of the United States makes the further claim that Mrs. Mishou has formally and effectually renounced all interest in the fund and that the entire fund must be distributed to him as claiming under Mrs. Sakrausky. (3) The issue of the deceased sisters of Mrs. Parker contend that the illegitimate daughters of Mrs. Taylor are not entitled to take as "issue" of a child of Mrs. Parker within the meaning of the word issue in the will; that the time under the rule against perpetuities began to run from the death of Mrs. Parker; that the limitation to the issue of Mrs. Parker's sisters is not too remote but is valid; and that such issue living at the death of Mrs. Parker's last surviving child (Mrs. Taylor) are entitled to take the entire fund by right of representation.

The judge of the Probate Court accepted the view last above stated and ordered the entire principal of the trust, whether derived from the 1851 trust fund or from Mrs. Parker's own property, to be distributed among the surviving issue of Mrs. Parker's sisters. The other interested parties appeal.

1. Any consideration of the questions presented in this case must begin with the rule laid down in *Minot* v. *Paine*, 230 Mass. 514, 523. In that case, after elaborate consideration, it was settled as the law of this Commonwealth that "the remoteness of an appointment, made in the exercise of a power to appoint by will alone, so far as affected by the rule against perpetuities must be measured from the time of the creation and not the exercise of the power" (230 Mass. at page 523), but that "the words of the rule are satisfied if it appears that in the light of facts as to relationship and longevity existent when the appointment is exercised, the estates created in truth will vest and take effect within the period limited by the rule, although this may not have been certain at the death of the donor of the power." 230 Mass. at page 522. The Restatement is in accord with *Minot* v. *Paine*. Restatement: Property, § 392. In the case at bar Mrs. Parker's power of appointment un-

der the indenture of 1851 was a testamentary power and did not include a power to appoint by deed in her lifetime. If the rule of *Minot* v. *Paine* applies, and if consequently the period fixed by the rule against perpetuities for the vesting of future interests must be calculated from 1851 when Mrs. Parker's power was created and not from 1878 when she exercised it, the result will be that the limitation of principal in Mrs. Parker's will, in so far as derived from property embraced in the 1851 trust, upon the decease of her last surviving child to the issue of her deceased children by right of representation and the alternative limitation to the issue of her deceased sisters will be too remote, since even with the aid of all facts as to relationship and longevity existing in 1878 these gifts might not finally vest in ascertained persons within any life or lives in being in 1851 and twenty-one years thereafter. *Minot* v. *Paine*, 230 Mass. 514, at page 522, and cases cited. Restatement: Property, §§ 374, 383. *Greenough* v. *Osgood*, 235 Mass. 235, 242 (as to limitation to children of Robert T. Osgood).

2. It is argued that the rule of *Minot* v. *Paine* does not apply where the power is "reserved" by the donor to himself rather than granted to another, that is to say, where the donor and the donee of the power are the same person. No authority for such a distinction is cited from any jurisdiction in which the rule of *Minot* v. *Paine* is adopted. The rule against perpetuities is a rule of public policy resting upon the view that it is socially undesirable that the alienation of property be fettered for long periods of time. So far as that object is concerned it would. seem to be immaterial whether in the beginning the power was granted or merely "reserved." The validity of the indenture of 1851 is not challenged. Under the indenture Mrs. Parker had no power of appointment by deed inter vivos. From the moment the indenture of 1851 took effect her right of alienation was appreciably restrained. See *Crawford* v. *Langmaid*, 171 Mass. 309; *Vinton* v. *Pratt*, 228 Mass. 468; 471; *Gorey* v. *Guarente*, 303 Mass. 569, 573-575. If the appointments contained in her will are held wholly valid, the result will have been that at no time from 1851 until

1943 could anyone have conveyed a fee in the beneficial interest of the property included in the 1851 trust. When tested by the facts in this case, this period would far exceed that permitted by the rule. As to the applicability of the rule of *Minot* v. *Paine* in the case of a "reserved" power see *Genet* v. *Hunt*, 113 N. Y. 158. Moreover, it can hardly be correct to assume, as the argument under examination does assume, that Mrs. Parker was the sole creator of the power. Before her marriage the indentured property was hers, but the indenture of 1851 was executed after her marriage. Her husband joined her in it as a grantor. Even at that time the greater part of this property was personalty. In 1851 the rights of the husband in his wife's personal property were so extensive that his joining as a grantor was certainly more than a mere form. See *Hayward* v. *Hayward*, 20 Pick. 517; *Smith* v. *Chandler*, 3 Gray, 392.

3. Since originally the greater part at least of the trust fund in controversy was composed of property over which Mrs. Parker had a testamentary power of appointment under the 1851 indenture, it may be convenient to deal first with the devolution of that appointive property.

It is a recognized principle in the law of property that where the donee of a general power attempts to make an appointment that fails, but where, nevertheless, the donee has manifested an intent wholly to withdraw the appointive property from the operation of the instrument creating the power for all purposes and not merely for the purposes of the invalid appointment, the attempted appointment will commonly be effective to the extent of causing the appointive property to be taken out of the original instrument and to become in effect part of the estate of the donee of the power. And where, as in this instance, the invalid appointment is in trust there will be a resulting trust to the estate of the donee of the power. It is unnecessary to restate the reasons for these rules. They originated in a series of decisions of the English courts and have been applied in our own cases of *Dunbar* v. *Hammond*, 234 Mass. 554 (see particularly page 558, paragraph 6), *Talbot* v. *Riggs*, 287 Mass. 144, and

*Old Colony Trust Co.* v. *Allen,* 307 Mass. 40, where many of the English cases are collected. They are adopted in Restatement: Property, § 365, and Trusts, § 426. We think that they apply in this case, and that the complete blending by Mrs. Parker in her will of the appointive property with any property owned by her outright shows her intent to capture the appointive property for her own estate (Restatement: Property, § 365, comment d), if indeed it is necessary that any such intent of the donee be shown affirmatively where the appointment is in trust and therefore technically valid to the extent of the bare legal title. See Restatement: Property, § 365 (2); Scott on Trusts, § 426; *Talbot* v. *Riggs,* 287 Mass. 144, 148.

We have not overlooked the case of *Bundy* v. *United States Trust Co.* 257 Mass. 72, at page 81, where this court said, "We are of opinion that *Dunbar* v. *Hammond* is limited to the case where the donor has made no provision for the donee's default of appointment, or for the event of his intestacy." No authority was cited for this statement. If this means that the principle of *Dunbar* v. *Hammond, Talbot* v. *Riggs,* and *Old Colony Trust Co.* v. *Allen* can never apply in any instance where the donor of the power has made a gift over in default of appointment, we think it is based upon a misapprehension of *Dunbar* v. *Hammond* and that it goes too far. As we read the will of Sally Hammond from the original record in *Dunbar* v. *Hammond,* the will in that very case did provide for default of appointment by any of the daughters to whom powers were given, [1] although this fact does not appear in the printed report of the case. Moreover, the rule of *Dunbar* v. *Hammond* and the other cases last above mentioned arises out of the broad character of the rights conferred upon the donee of a general power, which include the right to appoint to his own estate and closely approach, although they do not reach, complete ownership. See *Old Colony Trust Co.* v. *Allen,* 307 Mass. 40, 42. These rights are not lessened by the donor's insertion

---

[1] The material portions of this will can be found in *Olney* v. *Balch,* 154 Mass. 318, where the will was construed by this court.

of provisions to take effect only in default of appointment. If the statement referred to in *Bundy* v. *United States Trust Co.* were treated as stating a universal rule, it would conflict with Restatement: Trusts, § 426, comment b. The statement in *Bundy* v. *United States Trust Co.* was referred to in *Talbot* v. *Riggs*, 287 Mass. 144, 147, without indication of approval or of disapproval, but not as a ground of decision. It has not been mentioned in any of our other cases. It is opposed to many English decisions in which the rule followed in *Dunbar* v. *Hammond* has been applied although there was an express limitation in default of appointment. See, for example, *In re Pinède's Settlement*, 12 Ch. D. 667; *In re Van Hagan*, 16 Ch. D. 18; *In re Ickeringill's Estate*, 17 Ch. D. 151; *Willoughby-Osborne* v. *Holyoake*, 22 Ch. D. 238; *Coxen* v. *Rowland*, [1894] 1 Ch. 406; *In re Marten*, [1902] 1 Ch. 314; *In re Vander Byl*, [1931] 1 Ch. 216. We have seen no case that supports it. It may be that the fact that the donor of a power has made explicit provision for the devolution of the property in the event of nonexercise of the power, taken in connection with other circumstances, will sometimes have some tendency to indicate an intent of the donor that the donee shall not appropriate the appointive property to his own estate, but there are no circumstances in this case indicating such intent.

4. For the reasons stated, Mrs. Parker's exercise by her will of the power of appointment given her by the indenture of 1851 had the effect, by way of a resulting trust, of making the appointive property assets of her own estate. But it did not have the effect that some of the parties assume it had of subjecting that property to the terms of the trust under the residuary provisions of her will and therefore of making valid again the invalid limitations contained in those provisions on the theory that such limitations would not have been too remote and would have been valid, if made by Mrs. Parker at her death in 1878 as to her own property not governed by any power of appointment. It would be reasoning in a circle and a mere evasion of the rule of *Minot* v. *Paine*, 230 Mass. 514, to say that because those limitations were invalid and could not take effect

there was a resulting trust to Mrs. Parker's estate and then to say that because of such resulting trust the appointive property must go under the residuary provisions according to the invalid limitations. The same consequence must follow in this instance that commonly follows when future limitations of property are declared invalid because of the rule against perpetuities and that consequence is that "the will is to be construed as if no such provision or clause were contained in it; and the person or persons otherwise entitled to the estate or property will take it wholly discharged of the devise, bequest and limitation over." *Fosdick* v. *Fosdick*, 6 Allen, 41, 43. Since in the case before us the invalid limitations were the final limitations of the residuary clause itself and not in some other part of the will, the consequence was that the equitable fee in the principal of the appointive property, which by 1878 was all personalty, went as intestate property to the person or persons who by law would be entitled to Mrs. Parker's personal property in case of intestacy. *Fosdick* v. *Fosdick*, 6 Allen, 41, 47. *Lovering* v. *Worthington*, 106 Mass. 86. *Andrews* v. *Lincoln*, 95 Maine, 541. *Greenland* v. *Waddell*, 116 N. Y. 234, 245. Gray, Rule Against Perpetuities (4th ed.) § 540.1. As the statute of distributions stood in 1878, Richard T. Parker, husband of the testatrix, was her sole distributee. Gen. Sts. c. 94, § 16, Fourth. A vested equitable estate in the principal of the appointive property therefore went, upon Mrs. Parker's death, by resulting trust to Richard T. Parker in fee, subject to Mrs. Parker's valid appointments of income from the appointive property to her children, and upon Richard T. Parker's death in 1904 his interest in the principal went by his will, as his own property and not by virtue of his attempted exercise of his power of appointment under the indenture of 1851, to his three children, who were also Mrs. Parker's children, namely James Parker, the younger, Charles T. Parker, and Mary Martha Parker (Taylor) in the respective proportions hereinbefore stated.

5. But it is urged by the remote appointees of Mrs. Parker that because Richard T. Parker consented to Mrs. Parker's

will, acted as executor and nominated trustees under it, and accepted legacies of a life interest in the family plate and of her jewelry and articles of personal use and household furniture, he was estopped from receiving or retaining any other interest in her estate and became obligated to devote whatever would come to him to satisfying the limitations of her will, including those that would be too remote from the creation of Mrs. Parker's power in 1851, and that the children whose estates claim under him were similarly estopped. The doctrine of election is invoked by which it is held that one who receives a legacy under a will can make no claim against the will and must do all in his power to make effectual all parts of it. Richard T. Parker's consent to his wife's will at the time it was executed and his other acts merely recognizing her will as a will did not in our opinion amount to an election to accept the specific legacies given him in lieu of any interest he might have in his wife's property in case of a partial intestacy. *Tyler* v. *Wheeler*, 160 Mass. 206. Any election on his part must rest upon his acceptance of the legacies. This court has applied the doctrine of election in a number of cases, one of the latest instances being *Thurlow* v. *Thurlow*, 317 Mass. 126, where the earlier cases are collected. In all of our own decisions and, we believe, in nearly all of the cases decided elsewhere in which this doctrine has been applied the testator has attempted to dispose in his will of some property in which the legatee had an interest of his own paramount to that of the testator, and it was held that the legatee could not take the legacy without subjecting his own property to the will. It has been intimated that the doctrine does not extend beyond a case of that kind. *Ward* v. *Ward*, 15 Pick. 511, 526. But if it does, and if it goes so far as to require a legatee to elect between the legacy given him by the will and property which comes to him through an unexpected intestacy as to part of the testator's property (see *Bowers* v. *Smith*, 10 Paige Ch. 193), nevertheless the doctrine is one of equity and rests upon the theory that the testator presumably did not intend the legatee to have both the legacy and the property given by the will to another, and that in

substance the legacy was conditional. *Ward* v. *Ward*, 15
Pick. 511, 526. *Hyde* v. *Baldwin*, 17 Pick. 303, 308–309.
*Tyler* v. *Wheeler*, 160 Mass. 206, 209–210. *Noyes* v. *Noyes*,
233 Mass. 55, 60. The doctrine depends, not upon technical
rules, but upon principles of equity and justice. *Watson* v.
*Watson*, 128 Mass. 152, 155. We are not convinced that
we should presume that when Mrs. Parker gave her husband
legacies of certain articles of a highly personal character
having in all probability a peculiar value to him, sentimental
or otherwise, but not well adapted to augment a trust fund,
she intended that any condition should be attached to the
gift. We are aided to this conclusion by her own statement
in her will that it was at her husband's "own express re-
quest" that she made no further devise or bequest to him
or for his benefit. To enforce an election upon the husband
in this case would seem to us an extreme application of the
doctrine. We have seen no case that goes so far.

In the view we take we are not called upon to determine
whether election is ever required where to require it might
put pressure upon the legatee to make good limitations
which are otherwise against the public policy expressed in
the rule against perpetuities.[1]

It may be added that the children of Mrs. Parker were
not bound to any election because of their acceptance of
life interests in the income of the trust under her will. At
the time of such acceptance they had no interests in con-
flict with anything contained in the will and acquired none
until long afterwards when at the death of their father in
1904 they acquired by his will the interest in the property

---

[1] In England the law now seems to be settled that the court will not require
election in such cases. *Wollaston* v. *King*, L. R. 8 Eq. 165. *In re Oliver's
Settlement*, [1905] 1 Ch. 191. *In re Beales' Settlement*, [1905] 1 Ch. 256. *In
re Wright*, [1906] 2 Ch. 288. *In re Nash*, [1909] 2 Ch. 450, affirmed in Court
of Appeal, [1910] 1 Ch. 1. The case of *In re Bradshaw*, [1902] 1 Ch. 436,
442–446, holding to the contrary, has not been followed, although Professor
Gray believed it to be right. Gray, Rule Against Perpetuities (4th ed.)
§§ 561–561.6. Notwithstanding the eminent authority of Professor Gray,
several American cases agree with the English decisions. *In re Walkerly*,
108 Cal. 627. *Schuknecht* v. *Schultz*, 212 Ill. 43, 48. *Ford* v. *Yost*, 299 Ky.
682, 687–690. *Bowers* v. *Smith*, 10 Paige Ch. 193. See *Rieves* v. *Smith*, 184
Ga. 657, and cases collected in 162 Am. L. R. 165. But there are a few decisions
to the contrary. *Albert* v. *Albert*, 68 Md. 352. *Chipman* v. *Montgomery*, 63
N. Y. 221.

represented by the remote remainders, which in our view had long before that become his property and which they could freely take from him without losing the life interest which Mrs. Parker had given them.

6. We are unable to accept the further contention of some of the parties that in the indenture of 1851 Mrs. Parker retained a reversionary interest which was not subject to the rule against perpetuities and which passed by her will. It is true that she was to receive back the trust property, if she survived her husband, but she did not survive him, and in the events that occurred the title was completely exhausted according to the limitations of the indenture and any reversion was lost as a result of Mrs. Parker's exercise of her power vesting the appointive property in her own estate, and thereby leaving nothing in the nature of a reversionary interest. Moreover, the argument of some of the parties would, we think, require us to apply highly technical rules of the common law of real property to defeat the lawful intent of the creators of the 1851 trust. This we are not required to do. See *Sands* v. *Old Colony Trust Co.* 195 Mass. 575; *National Shawmut Bank* v. *Joy,* 315 Mass. 457, 463–464; *Doctor* v. *Hughes,* 225 N. Y. 305, 311–312; *Abbiss* v. *Burney,* 17 Ch. D. 211, 230–233; Scott on Trusts, § 59.

7. We cannot accept the contention made by the issue of Mrs. Parker's sisters that because probate accounts of the trustees under Mrs. Parker's will making no distinction between assets of the trust derived from Mrs. Parker's own estate and assets derived from the appointive property have been adjudicated and allowed all parties are now precluded from insisting that any of Mrs. Parker's appointments were invalid. We do not see that these accounts dealt in any way with the disposition of the principal of the trust under Mrs. Parker's will. The life estates to her children were valid to the extent of their original shares of income before augmentation by the death of any of them. While these life estates were running there was but a single trust which included both Mrs. Parker's own property and the appointive property, and the fact that the fund was accounted for

as a single fund is without significance with reference to distribution of the principal. For similar reasons none of the present claimants is chargeable with laches.

8. Having come to the conclusion that the principal of the property derived from the 1851 trust passed, subject to the life interests of the children under the trust in Mrs. Parker's will, to Richard T. Parker and through his will to the children, the next step is to ascertain what proportion of the present trust fund is attributable to the 1851 trust. This is a question of fact, but since the evidence is reported and the material portions consist of agreed facts and documents and nothing depends upon the credibility of witnesses, it is for us to determine the fact for ourselves without regard to the finding of the trial judge. *Veazie* v. *Staples*, 309 Mass. 123, 127. *Pitman* v. *Pitman*, 314 Mass. 465, 475.

The inventory of Mrs. Parker's estate filed by her executor in 1878 obviously included appointive property as well as that owned by Mrs. Parker. That inventory showed total assets of $150,205.55. It has been found possible, evidently by the expenditure of much effort, to trace every item in this inventory to the 1851 trust by proof which we consider clearly sufficient, except an item of cash of $5,540.55, and an item of "household furniture and other articles appraised at 5,000" (both items being in all probability, and as we find, Mrs. Parker's own property), and except also the following: six shares of Cocheco Manufacturing Company, two shares of Jackson Manufacturing Company, seven shares of Railroad Bank, forty-five shares of Boston and Maine Railroad, twenty-three shares of Ogdensburg and Lake Champlain Railroad Company, and twenty-four shares of Mercantile Marine Insurance Company. It appears, however, with reference to the Cocheco and Jackson stocks, that on October 2, 1851, the date of the 1851 indenture, James Parker the elder, the original trustee under that indenture, signed a receipt attached to a final account of the guardian of Mrs. Parker in which James Parker the elder as trustee acknowledged receipt from the guardian of various securities, including a list of mill stocks. This list

is practically identical with a list of mill stocks which appears in exactly the same order in the 1878 inventory of Mrs. Parker's executor. It includes two shares of Jackson Manufacturing Company and four (not six) shares of Cocheco. As to the Railroad Bank a similar situation exists. Seven shares were listed in the receipt given by the trustee under the indenture to Mrs. Parker's guardian in 1851. In the absence of any evidence to the contrary we think it is fairly inferable, and we find, that the two shares of Jackson, four of the six shares of Cocheco and the seven shares of Railroad Bank inventoried by the executor in 1878 came from the 1851 trust. As to the two extra shares of Cocheco and the railroad stocks named above we think the evidence goes no farther than to raise a plausible conjecture, but does not amount to proof, that these came from the 1851 trust instead of being Mrs. Parker's own property. There is no satisfactory evidence that the Mercantile Marine Insurance stock came from the 1851 trust. We are of opinion that the burden of proof rests upon those who are endeavoring to separate particular items from the general mass of assets that were inventoried in Mrs. Parker's estate and to assign those items to a particular source. It follows that two shares of Cocheco, the railroad stock above named, and the Mercantile Marine Insurance stock are to be treated as Mrs. Parker's own property. For present purposes one share of Fifty Associates and an insurance policy in Massachusetts Hospital Life Insurance Company which were not inventoried by the executor but which actually came into the hands of Mrs. Parker's testamentary trustees should be treated as if added to the securities inventoried by the executor. Both were derived from the 1851 trust. The insurance policy should be put in at $4,500 actually realized from it by the trustees. The executor received $684.46 of income while the estate was in his hands of which $467.46 came from property which had belonged to the 1851 trust and $217 is not shown to have come from such property.

It is believed that the foregoing findings will enable a calculation to be made with reasonable accuracy of the sum

that in theory was added to Mrs. Parker's estate and that was derived from the 1851 trust fund. The "household furniture delivered to Richard T. Parker" amounting to $2,067.76 appears to have been a specific legacy chargeable only to Mrs. Parker's own property. Debts, expenses, and pecuniary legacies paid by the executor [1] are chargeable pro rata against the property derived from the 1851 trust and Mrs. Parker's own property. Debts and expenses are not chargeable first against the owned property in exoneration of the appointive property under the principle illustrated by *Tuell* v. *Hurley,* 206 Mass. 65. See also *Dexter* v. *Jackson,* 245 Mass. 333; *Slayton* v. *Fitch Home, Inc.* 293 Mass. 574, 580; and *Ferguson* v. *Massachusetts Audubon Society,* 316 Mass. 436, 451–452. That principle does not apply where, as here, the donee of the power has in effect appointed to his own estate and has thereby subjected the appointive property to these burdens equally with his own property. *Tuell* v. *Hurley,* 206 Mass. 65, 68. The proportions of the fund actually turned over to or realized by the trustees under Mrs. Parker's will that came respectively from the 1851 trust and from Mrs. Parker's own property will be the same as those in which the property was held by the executor according to the calculation above outlined immediately before he turned it over to the trustees.

It is recognized that the figures arrived at by this method will not be free from the possibility of error, but it is believed that any error will be slight and that the results will fall within the limits of probability and will not be conjectural. No better method by which the assets of the present trust that came from the 1851 trust can be distinguished from those that came from Mrs. Parker's own property is now available than that supplied by the respective proportions in which the fund was originally derived from these two sources. See Scott on Trusts, § 519.

---

[1] By Mrs. Parker's will these legacies were payable by the trustees out of the trust fund, but in fact they were paid by the executor. The fact that the executor paid them seems immaterial since, whoever paid them, they would come out of the fund otherwise available for the residuary trust and would be paid out of Mrs. Parker's own property and out of property that came from the 1851 trust in the same proportions in which the residuary trust fund itself came from those two sources.

9. It next becomes necessary to determine to whom should be distributed the small percentage of the present trust fund which the foregoing method of calculation will show was derived from Mrs. Parker's owned property and not from the 1851 trust. So far as concerns Mrs. Parker's owned property the time prescribed by the rule against perpetuities began to run with her death and not in 1851, and as by her will final distribution of the trust thereby created was to be made upon the death of her last surviving child, all limitations of her own property were bound to vest within a life in being at her death and were valid.

The question in this part of the case is whether the illegitimate daughters of Mrs. Parker's child Mrs. Taylor are comprehended within the expression "the issue of my deceased children" as used in Mrs. Parker's will. We can hardly regard this as an open question in this Commonwealth. It cannot be doubted that by the common law of a few generations ago such words as issue, children, descendants, and so forth as descriptive of a class in a grant, devise, or legacy, in the absence of anything indicating a contrary intent, meant only persons of the class who were born in lawful wedlock. In the case of *Adams* v. *Adams*, 154 Mass. 290, at page 292, this court said without qualification, "The word 'children' in a Massachusetts will means legitimate children." In *Hayden* v. *Barrett*, 172 Mass. 472, at page 474, this court said, ". . . it is also well settled that, in the absence of any language clearly expressing the contrary, all general words in the statutes of distribution, such as 'child,' 'children,' 'next of kin,' and similar words descriptive of classes who are to inherit, do not include illegitimate children. . . . And so of similar expressions in a Massachusetts will." In *Green* v. *Kelley*, 228 Mass. 602, at page 606, this court, speaking of words in a will, said, "'Lineal descendants' means the legitimate immediate and remote progeny in direct line." And again on the same page and the page following the court said, "The lineal descendants of any resident of Massachusetts, according to its law, are those who by the law of the State of their domicil of origin and residence are the legitimate issue of that person." In *Sanford* v. *Marsh*, 180

Mass. 210, at page 211, this court said, "The common law on this subject is in force in Massachusetts, except as it has been changed by statutes. The statutes which have been adopted here have all been construed strictly." The statements in *Welch* v. *Colt*, 228 Mass. 511, at page 515, and in *Manning* v. *Manning*, 229 Mass. 527, at page 532, and similar expressions in some other cases are not to be taken as in conflict with the cases hereinbefore cited. It is plain that in these cases the court had in mind no question of legitimacy.

The word issue in a Massachusetts will must be interpreted against a background of statutory phraseology and construction which has remained wholly consistent for well over a century. It is provided by G. L. (Ter. Ed.) c. 4, § 7, Sixteenth, that in construing statutes unless a contrary intention clearly appears " 'Issue,' as applied to the descent of estates, shall include all the lawful lineal descendants of the ancestor." The provision of G. L. (Ter. Ed.) c. 191, § 20, in behalf of a child or the issue of a deceased child unintentionally omitted from a will does not aid an illegitimate child or the illegitimate issue of a deceased child. *Kent* v. *Barker*, 2 Gray, 535. *King* v. *Thissell*, 222 Mass. 140. *King* v. *Dolan*, 255 Mass. 236. Illegitimate children are not within the description "children" in the workmen's compensation law. *Gritta's Case*, 236 Mass. 204. *Di Clavio's Case*, 293 Mass. 259, 263. The grandparents of an illegitimate child are not as his "kindred" liable for his support under G. L. (Ter. Ed.) c. 117, § 6. *Plymouth* v. *Hey*, 285 Mass. 357. And see further *Cooley* v. *Dewey*, 4 Pick. 93; *Curtis* v. *Hewins*, 11 Met. 294; and *Pratt* v. *Atwood*, 108 Mass. 40.

The presumption that children or issue in a will means legitimate children or issue in the absence of indications to the contrary has not in this Commonwealth been thought to be affected by the provisions of G. L. (Ter. Ed.) c. 190, § 5, whereby an illegitimate child may in case of intestacy inherit from or through his mother. Practically all the cases hereinbefore cited and all those in which the court was speaking of the interpretation of wills were decided while

this statute or similar predecessor statutes were in force. Neither is the meaning of the word "issue" affected by the construction given to the word "heirs" in a will by *Lavery* v. *Egan*, 143 Mass. 389, since the word "heirs" was there held by definition to mean those who take by the law of intestate succession, including illegitimates when illegitimates can inherit.

We are aware that the position we feel bound to take is not fully in accord with Restatement: Property, §§ 265, 286, 292, but it is in accord with decisions and statements in opinions in many other jurisdictions (including some in recent cases) which may still be said to represent the weight of authority. See, for example, *Johnstone* v. *Taliaferro*, 107 Ga. 6, 20; *Marsh* v. *Field*, 297 Ill. 251, 256; *Brisbin* v. *Huntington*, 128 Iowa, 166, 174, 180; *Lyon* v. *Lyon*, 88 Maine, 395; *Heater* v. *Van Auken*, 1 McCarter, 159; *Brown* v. *Holland*, 221 N. C. 135; *In re Thorn's Estate*, 353 Pa. 603; *Central Trust Co.* v. *Skillin*, 154 App. Div. (N. Y.) 227; *Matter of Cady's Estate*, 257 App. Div. (N. Y.) 129, affirmed 281 N. Y. 688; *Will of Scholl*, 100 Wis. 650, 662; *Flora* v. *Anderson*, 75 Fed. 217, 235–236; Page on Wills, § 1027. Many New York decisions are collected in *Matter of Underhill's Estate*, 176 Misc. (N. Y.) 737. A contrary view has been taken in Rhode Island (*Rhode Island Hospital Trust Co.* v. *Hodgkin*, 48 R. I. 459) and in Virginia (*Bennett* v. *Toler*, 15 Grat. 588), and the common law rule seems never to have been accepted in Connecticut. *Eaton* v. *Eaton*, 88 Conn. 269.

If this rule of construction is deemed too harsh, the remedy is not to be found in sudden and unheralded changes by judicial decision in the meanings of words which have long been established and accepted and in reliance upon which wills have been drafted and settlements of property effected.

Nothing appears in Mrs. Parker's will or in the circumstances of the case to indicate that she did not use the word "issue" in the sense attributed to it by established legal usage. It follows that Mrs. Taylor's illegitimate daughter Mrs. Mishou, and the Attorney General of the United States, who claims under the other illegitimate daughter,

Mrs. Sakrausky, cannot take, and that so much of the principal of the trust fund as is attributable to Mrs. Parker's owned property must be distributed by right of representation among the issue of Mrs. Parker's sisters who were living at Mrs. Taylor's death.

The usual course would be to distribute as much of the principal of the trust fund as is attributable to the 1851 trust to the administrator with the will annexed of Richard T. Parker. *Old Colony Trust Co.* v. *Clarke*, 291 Mass. 17, 23. But the administrator requests that as a matter of convenience distribution be made directly to the representatives of the estates of James Parker, the younger, Charles T. Parker, and Mary Martha Taylor. Ancillary probate was granted in this Commonwealth more than thirty years ago upon the will of Richard T. Parker, who died a resident of New Hampshire. If the Probate Court is satisfied that his estate has been fully settled, there seems to be no objection to the making of distribution as requested directly to those who in any event are finally entitled to receive the money. *Boston Safe Deposit & Trust Co.* v. *Stratton*, 259 Mass. 465, 472–473. *Old Colony Trust Co.* v. *Shackford*, 291 Mass. 361, 365. Such income as has accrued since the principal became distributable at the death of Mrs. Taylor is to be treated as accretion to the principal.

In making distribution as between the estates of Charles T. Parker and Mary Martha Taylor the trustee is to withhold from the latter estate and to pay to the former estate a sum sufficient to correct any overpayments of income which the Probate Court upon rehearing of the trustee's accounts in accordance with the rescript in the companion case of *Porotto* v. *Fiduciary Trust Co. post*, 638, may determine have heretofore been made to Mary Martha Taylor in her lifetime. *Minot* v. *Purrington*, 190 Mass. 336, 341–342. *Case* v. *Clark,* 220 Mass. 344.

The decree is reversed and the cause is remanded to the Probate Court for the entry of a decree in accordance with this opinion. Costs and expenses of appeal are to be in the discretion of the Probate Court.

*So ordered.*