STATE STREET BANK AND TRUST COMPANY & another, trustees, *vs.* BARBARA HICKS D'AMARIO & others.

Suffolk.   March 6, 1975. — August 28, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Adoption.   Trust,* Adopted child, Power of appointment, Vested right.   *Power of Appointment.   Words,* "Vested."

Under an inter vivos trust established long before 1958 and providing for its termination upon the death of the settlor's daughter and that if no children or issue of any deceased child of hers should then be living the trust should be distributed as she should by will appoint, her general power of appointment was well within the latitudinous words "interests or rights" as they appear in a saving proviso in § 2 of St. 1969, c. 27 [550-551]; and, since by the effective date of that statute the daughter had passed an age beyond childbearing, her "interest" or "right" in the trust had then attained complete substantiality and had vested [551]; the proviso precluded G. L. c. 210, § 8, as appearing in § 1 of St. 1969, c. 27, from conferring rights in the trust on children of her husband by a

---

previous marriage adopted by the daughter but not benefited by her exercise of the power [552-554].

PETITION filed in the Probate Court for the county of Suffolk on March 19, 1973.

The case was heard by *Warner, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Joseph R. Watkins* stated the case.

*Paul B. Sargent* for the defendants D'Amario & another.

*Francis V. Hanify,* Assistant Attorney General (*Timothy J. Lane, Jr.,* with him) for the Attorney General.

*John A. Perkins* for the Salvation Army of Georgia.

KAPLAN, J.  The petitioners State Street Bank and Trust Company and Ernest G. Angevine, as trustees under a declaration of trust dated March 18, 1919 (as amended), by Charles F. Bacon, late of Brookline, Massachusetts, commenced this suit in a Probate Court praying instructions as to their duty upon the termination of the trust at the death of the life beneficiary, Mrs. May Bacon Hicks, daughter of the settlor.  The trustees were in doubt whether they were required to distribute the capital of the trust in accordance with the exercise by Mrs. Hicks of a general testamentary power of appointment conferred on her by the declaration of trust, or rather to regard the exercise of the power as ineffective and to distribute the capital to the respondents Barbara Hicks D'Amario and Caroline Hicks Lawrence, adopted children of Mrs. Hicks.  The probate judge ruled that the property was to pass according to the exercise of the power, and the adopted children appeal.[1]  As will be seen, the problem involves an interpretation of a saving proviso in § 2 of St. 1969, c. 27, effective September 1, 1969, language which has twice before been construed by our

---

[1] Besides the adopted children, the respondents named in the trustees' petition were the executor and trustees under the will of Mrs. Hicks, the Salvation Army, and the Attorney General.

court in *Billings* v. *Fowler*, 361 Mass. 230 (1972), and *Boston Safe Deposit & Trust Co.* v. *Dean*, 361 Mass. 244 (1972), whose teaching we are bound to follow here.

1. The declaration of trust stated that the income of the property placed in trust was to be paid to the settlor's sister Belle Bacon (forty-five per cent) and his daughter May Bacon (later, by marriage, May Bacon Hicks) (fifty-five per cent),[2] the survivor to receive all the income for the rest of her life (except for a certain income provision for any issue of the life tenant first deceased). Upon the death of the survivor, the trust was to terminate. Article Second (as amended) of the declaration of trust dealt as follows with the distribution that was then to be made:

"Said trust shall terminate on the death of the survivor of my said daughter and my said sister and the . . . trustees . . . shall then divide the capital of said trust fund among the issue of my said daughter then surviving, such issue taking by right of representation; . . . if at the termination of the trust there shall be living no children of my said daughter and no issue of any deceased child, the trustees shall, if I be then living, pay over the capital of said trust fund to me free and discharged of all trusts . . . but if . . . I shall not be living and there shall be living no children of my said daughter and no issue of any deceased child, the . . . trustees shall pay over and distribute the capital of said trust fund as my said daughter may by will appoint and, in default of such appointment, to the persons who would then be entitled to receive the same had I then died intestate, a resident of Massachusetts, seized and possessed of said property."

In 1919, the daughter May was twenty-seven years old and unmarried. The settlor died in 1930 and at that point the declaration of trust became irrevocable.[3]  In

---

[2] Before amendment, the percentages were twenty and eighty.

[3] By the original terms of the declaration of trust, the trust could be terminated by the settlor at any time during his life. By an amendment of July 20, 1928, the trust could be terminated after July 31,

1934, May married Frederick B. Hicks. The settlor's sister Belle, with whom Mrs. Hicks had shared the income, died in 1937, and the entire income became payable to Mrs. Hicks as the survivor. There were no children of the marriage of Mr. and Mrs. Hicks. In 1941, the couple adopted Barbara and Caroline Hicks, children of Frederick by a previous marriage; the girls were eleven and fifteen years old. Mrs. Hicks died on July 25, 1972, at the age of seventy-nine. The husband Frederick and the adopted daughters survived.

Mrs. Hicks's will, executed on June 1, 1971 (with codicil of December 22, 1971), expressly exercises the power of appointment conferred by her father's declaration of trust. The will provides that the residue of the testatrix's estate (after certain specific bequests), "including all property over which I have a power of appointment under a Declaration of Trust made by my father, Charles F. Bacon . . . which power I hereby expressly exercise," shall pass to trustees, who are to pay from income, and also from principal if need be, the sum of $75,000 annually for the benefit of the testatrix's husband Frederick until his death, any remaining income to be paid annually to the Salvation Army. This trust is to terminate upon the death of Frederick, and all property then in the hands of the trustees shall be converted into cash; the fund thus created is to be known as the "May Bacon Fund" and shall be paid over to the Salvation Army, the income to be used by the Southern Territory toward the operational cost of the School for Officers Training.

---

1928, and during the lifetime of the settlor, by the settlor together with his daughter May, if she was living, otherwise together with his sister Belle.

Originally, the final distribution in default of appointment was stated to be to those entitled had May died intestate, a resident of Massachusetts owning the property; and amendment of July 20, 1928, changed this (as indicated in the quotation in text) to those entitled had the settlor died intestate, a resident of Massachusetts owning the property.

The will bequeaths $1,000 to each adopted daughter if she survives the testatrix, and goes on to state: "I purposely make no gift herein to my adopted daughters other than as above set forth because I feel that in the years since their adoption I have more than fulfilled any obligation I might have to provide for them."

2. Just prior to the effective date of the 1969 legislation, and for a long time before that, Mrs. Hicks's situation under the declaration of trust was clear and definite. The words "child," "children," and "issue" appearing in Article Second would be read as referring to her biological child, children, and issue, and as not comprehending her adopted daughters.[4] By 1930, Mrs. Hicks had outlived her father, a condition of her power of appointment. When she married in 1934 she was already forty-two years old; at some date many years before 1969, she must be assumed to have become incapable of bearing children. At that point she held a general testamentary power of appointment without any clog or impediment.

The 1969 legislation, which is reproduced in the margin,[5] stated generally in § 1 that words such as

---

[4] See the text and n. 6 below.

[5] Statute 1969, c. 27, reads as follows:

"Section 1. Chapter 210 of the General Laws is hereby amended by striking out section 8, as amended by section 1 of chapter 121 of the acts of 1958, and inserting in place thereof the following section: —

"*Section 8.* The words 'child', 'grandchild', 'issue', 'heir' or 'heir-at-law', or their respective equivalents, in a grant, trust settlement, entail, devise or bequest, shall include one who is adopted to the same extent as if born to the adopting parent or parents in lawful wedlock, whether the adoption was decreed before or after the date of execution or the effective date of any such grant, trust settlement, entail, devise or bequest, unless the contrary plainly appears by the terms of the instrument.

"Section 2. The provisions of section eight of chapter two hundred and ten of the General Laws, as amended by section one of this act, shall be applicable to all grants, trust settlements, entails, devises or bequests whether the same were executed or effective before or after

"child" or "issue" in a grant or devise should be taken to "include one who is adopted to the same extent as if born to the adopting parent or parents in lawful wedlock," whether the adoption occurred before or after the date of the instrument, "unless the contrary plainly appears by the terms of the instrument." This was consistent with, and enhanced, the long standing congenial attitude of the Commonwealth toward the property rights of adopted children. But to safeguard certain existing expectations, a proviso was written into § 2 — that the rule of § 1 should not apply to any grant or devise "which was executed or effective prior to . . . [August 26, 1958] with respect to any interests or right therein which had vested prior to the effective date of this act," i.e. September 1, 1969. (The particular significance of the date August 26, 1958, is indicated in the margin.[6]) Our question then is whether the power of appointment in Mrs. Hicks set out in the 1919 declaration of trust was an "interest" or

---

the effective date of this act provided that said provisions shall not apply to any such grant, trust settlement, entail, devise or bequest which was executed or effective prior to August twenty-six, nineteen hundred and fifty-eight with respect to any interests or right therein which had vested prior to the effective date of this act.

"Section 3. This act shall take effect on September one, nineteen hundred and sixty-nine."

[6] Before 1958, G. L. c. 210, § 8 (representing the substance of the law since 1876), provided that "child" (and cognates) should include "a child adopted by the settlor, grantor or testator, unless the contrary plainly appears by the terms of the instrument"; but if the settlor, grantor, or testator was not himself the adopting parent, then the child by adoption should not have the rights of a child born to the adopting parent, unless "it plainly . . . [appeared] to have been the intention . . . to include an adopted child." In 1958, c. 210, § 8, was amended by St. 1958, c. 121, § 1, to eliminate the distinction between children adopted by the settlor, grantor, or testator, and those adopted by others — in either case "child" was to include an adopted child "unless the contrary plainly . . . [appeared] by the terms of the instrument." But c. 121, § 2, made the § 1 amendment applicable "only to grants . . . [and so forth] executed after the effective date of this act," which was August 26, 1958.

"right" which had "vested" prior to September 1, 1969, within the meaning of the proviso.[7]

3. In *Billings* v. *Fowler,* 361 Mass. 230 (1972), the petitioner's mother died in 1928 leaving a will which provided (we simplify the terms somewhat) that during a period measured by the life of the survivor of her three children, plus twenty-one years, income should be paid equally to the children, the issue of any child who died during that period to take the share of the deceased parent; if any child died without issue, the income was to be divided between the two surviving children. At the end of the period, the principal was to be distributed in equal shares to the testatrix's grandchildren then living, and to the then living issue of any deceased grandchild, such issue to take the share the grandchild would have taken had he or she survived to the end of the period. Just prior to the effective date of the proviso in the 1969 statute, the three children of the testatrix were alive; of these, one son, William, had children and grandchildren; a second son, Philip, had no children or issue; the third child, a daughter, Katherine, had a biological son, George, and an adopted daughter. The testatrix's daughter Katherine (the adoptive parent), attempting to do some estate planning, petitioned for a declaration, in effect, that her adopted daughter should be treated as a biological child — thus implicitly contending that any interest or right that might be diminished or displaced by such treatment of the adopted child had not become "vested" prior to September 1, 1969.

The petitioner Katherine's biological son George did not oppose the petition, but the petitioner's brother William, and William's three children (respondents), did. Putting out of consideration the adopted child, the

[7] We pass over the possibility that it "plainly appears" by the declaration of trust that the references therein to "child" (and cognate words) were intended not to include adopted children. But see the discussion in the text below of the probable intention of Mrs. Hicks and her father.

respondents (as well as possible children of George, represented by a guardian ad litem) had substantial chances of taking income and principal under the will, although the timing and amounts of the takings were still dependent on the happening of vital events. (For example, William's three children could each expect to receive a twenty-five per cent share of the principal, petitioner's son George taking the other twenty-five per cent, when the trust terminated, and the only condition for their receiving these shares was their survival.) However, there would be a significant reduction in the probabilities of some of their takings, and in the size of other takings, if the adopted child were considered to have rights. Accordingly the interests or rights involved were held "vested" in the sense of the 1969 proviso.

The teaching of the *Billings* opinion is that the characterization of a given "interest" or "right" by formal property law as vested or contingent does not determine whether it is "vested" for the present purpose. "We think the proviso in § 2 of the 1969 statute cannot fairly be viewed as adopting technical concepts whether an interest is vested or contingent . . . but contemplates appraisal whether, in substance, the interest is sufficiently established to constitute an interest or right which had accrued to its holder." 361 Mass. at 240. The words "interests or right" repel any technical reading and invite a common-sense interpretation. (Here, as elsewhere, the court's analysis of § 2 is buttressed by a consideration of *Tirrell* v. *Bacon*, 3 Fed. 62 [D. Mass. 1880].[8]) Whether a given "interest" or "right" is to be called "vested" as against the adopted child turns on the substantiality of the chances that the person concerned would in fact enjoy the interest or right, apart from any claim by the adopted child, and the substantiality of the threat to that

---

[8] See the *Tirrell* case, 3 Fed. at 65, and the *Billings* case, 361 Mass. at 238-239. The *Tirrell* case construed a saving proviso in legislation of 1876.

enjoyment that would be created by admitting the adopted child as a taker on the same footing as a biological child. The court in *Billings* declined to accept a view that had been urged on it by the petitioner, that "the only interests which the 1969 proviso was meant to preserve were an 'immediate right in an ascertained person in present possession and enjoyment, or a presently fixed right of future enjoyment in an ascertained person.'" 361 Mass. at 239. This was the standard adopted by the Rhode Island Supreme Court in *Prince* v. *Nugent*, 93 R. I. 149, 160, 162-163 (1961), interpreting a "somewhat comparable statute," 361 Mass. at 239, and purporting to assign to the word "vested" the "technical meaning it has in the law of property." 93 R. I. at 162. Our court took a nontechnical view considered fairer in the circumstances of the case: it suggested that it should be enough here that interests or rights had "accrued . . . subject only to total or partial defeat by biological events." 361 Mass. at 241. "At least as to biological children and grandchildren of the testatrix, living prior to September 1, 1969, the effective date of the 1969 statute, we think that the interests . . . of each of them in the trust income or corpus became vested in right at the testatrix's death or at their own births." 361 Mass. at 241.

4. Turning to the facts of the present case, we have first to deal with the suggestion that the *Billings* case is irrelevant because a power of appointment, even a general one to appoint by will, does not fit at all as an "interest" or "right"; rather it is a sort of "agency" granted by the donor to the donee to exercise an authority over the donor's property; the property never "belongs" to the donee, but to the donor; the donee is merely a "conduit." Sometimes, no doubt, for particular purposes, the law looks at a power of appointment that way. See *Angevine* v. *Commissioner of Corps. & Taxn.* 367 Mass. 826 (1975). But in interpreting the 1969 statute, the "conduit" picture of the power is quite

inapposite. In practical terms the donee has a considerable bundle of rights, and the power is well within the latitudinous words "interests or right" as they appear in the statute. We should recall that a general power confers on the donee large rights of disposition of the corpus, so that he can appoint to anyone including himself (i.e., his estate), see *Garfield* v. *State St. Trust Co.* 320 Mass. 646, 656 (1947); Am. Law of Property, § 23.12, pp. 490-491 (1952); and creditors can reach the property in case he appoints it and dies insolvent, see *State St. Trust Co.* v. *Kissel,* 302 Mass. 328, 335-336 (1939); Restatement; Property, § 329 (1940). It is a mark of how a general power may be regarded by the donee and others that a residuary clause in his will will appoint the property. See *Beals* v. *State St. Bank & Trust Co.* 367 Mass. 318 (1975).

As to the substantiality of Mrs. Hicks's interest in the sense of probabilities as mentioned above, it can equally be said of Mrs. Hicks's power of appointment, as was said of the respondents' interests in *Billings,* that the interest or right was "accrued . . . subject only to total . . . defeat by biological events," at the time her father died, for it could then be defeated only by her having a child and being survived by the child or its issue. But the case actually presented is stronger, since by 1969, and indeed many years earlier, that biological possibility had been eliminated: when Mrs. Hicks reached an age beyond childbearing, her "interest" or "right" had attained greater — one may say complete — substantiality in that it was no longer subject to defeat even by vital events. In this respect the case resembles *Boston Safe Deposit & Trust Co.* v. *Dean,* 361 Mass. 244 (1972),[9] thought to be

---

[9] In the *Dean* case what was in question was the admission of an adopted child to a class of natural children who were currently receiving income, and whose shares in the income could no longer be reduced by the occurrence of any biological or other events under the terms of the trust; but the admission of the adopted child would reduce their shares.

"an easier case" than *Billings.* 361 Mass. at 248. And admission of the adopted daughters here would not merely reduce Mrs. Hicks's interest, as was the case with regard to the respondents' interests in *Billings,* but would eliminate it.[10]

It was the purpose of the 1969 proviso to safeguard a range of reliances on interests and rights created in instruments executed before August 26, 1958 (the problem will not arise as to later instruments). Reliance is tied to substantiality. Mrs. Hicks, holding the power of appointment, indefeasibly, over a long period of time, could well have relied on it (and with perfect reason, at least until 1969). Her very initial decision formally to adopt the children by her husband's prior marriage might have taken into account that they could not obstruct the exercise of her power; but that apart, she could have made gifts to persons during her lifetime, including gifts to the daughters, and expected, accordingly, not to favor them, but others, when she died. She could have omitted to make inter vivos provision for the event of her husband's surviving her, relying on her exercise of the power to see to his financial security. If the 1969 proviso is held not to apply, the interest or right in the shape and dimensions granted in the declaration of trust to Mrs. Hicks is taken away from her, and her reliances are upset. (Be it noted that even if Mrs. Hicks knew positively after 1969 that the adopted daughters would take if they survived her, defeating her power of appointment, she might by that time have thoroughly committed herself and been unable to rearrange her affairs to adjust for her disappointed plans and expectations.)

5. A final argument on behalf of the adopted children notes that the *Billings* opinion said the 1969 proviso may

---

[10] We should add here that "accrual subject to defeat by biological events" need not be accepted as a strict formula decisive of all cases. The present case, however, meets that test and satisfies as well any broader considerations of substantiality.

have been enacted to avoid questions about unconstitutional retroactivity that would arise if so called vested interests or rights were tampered with.   It is then asserted that the Legislature, if it chose to exert itself, could constitutionally have enacted affirmatively that the adopted children should take in circumstances like the present, because — so the argument goes — the Legislature has broad power over testamentary dispositions. Therefore the statutory proviso should be read not to cover the present case.

We do not think this is a proper occasion for attempting to decide how far, theoretically, the Legislature's power may go.   "Although the rule against retroactivity has been applied to destroy the validity of many acts, its principal function has been to impose rules of strict construction upon retrospective legislation."   Sands, Sutherland Statutory Construction, § 41.04, p. 252 (4th ed. 1973).   Correspondingly, the court in the *Billings* case gave a reasonable content to the saving proviso applying to instruments executed before August 26, 1958. We may mention that, if a constitutional question were reached, it would not be about the Legislature's power to curtail in some way the capacity of persons to make future testamentary provisions, but rather the Legislature's power to destroy a long-since executed gift of rights that by the terms of the instrument — the declaration of trust — had become indefeasible.

Our conclusion is that Mrs. Hicks's appointment under her power should be given effect, and it is a satisfaction to note that the intentions of the principals — Mrs. Hicks and her father — as far as they can be discerned, are not palpably disserved, and are probably well served, by the result.   As to Mrs. Hicks there is no doubt.   As to the father, he made his declaration of trust when the law was such that the words used would not extend to adopted children of Mrs. Hicks, and it is not unreasonable to assume that his intention accorded with that law. Cf. *Fiduciary Trust Co.* v. *Mishou*, 321 Mass. 615, 636

(1947). His disposition left it to Mrs. Hicks's judgment what she might want to do about anyone not of her (and therefore his) blood when she came to exercise her power. It is a strain to imagine that the father's intention was to cut off any choice on Mrs. Hicks's part and to benefit children she might adopt although she was not disposed to benefit them.

6. The adopted children question the form of Mrs. Hicks's appointment by will under her power, particularly in so far as the will states that in the event the Salvation Army ceases to exist or function the "May Bacon Fund" is to be returned to the trustees and by them distributed to a charitable institution of their choosing. The question goes to the trustees' breadth of discretion. It is enough to say that this was not a question on which the petitioning trustees sought instructions; had it been asked it might well have been considered too remote and speculative to require an answer.

*Decree affirmed.*